Merrimack County Probate Court
No. 2002-346

## IN RE ESTATE OF JOHN ALBERT HOLLETT

Argued: July 10, 2003
Opinion Issued: September 26, 2003

*Wyskiel, Boc & Tillinghast, P.A.,* of Dover (*William E. Boc* and *Michael J. Bolduc* on the brief, and *Mr. Boc* orally), for the petitioner.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Ralph F. Holmes* on the brief and orally), for the respondents.

DUGGAN, J. The petitioner, Erin Hollett, appeals an order by the Merrimack County Probate Court (*Patten*, J.) declaring the prenuptial agreement made between Erin and the decedent, John Hollett, to be valid. Erin argues that the agreement should be set aside because of duress, undue influence, insufficient financial disclosure, and lack of effective independent counsel. The respondents, Kathryn Hollett, the decedent's first wife, and their five children, argue that the agreement is valid and the probate court's order should be affirmed. We reverse and remand.

The following facts were found by the trial court or are evident from the record. John and Erin married on August 18, 1990. Their courtship had begun in 1984, when John was fifty-two and Erin was twenty-two. John was a successful real estate investor and developer who regularly bought and sold property in New Hampshire and Florida. He had considerable experience with attorneys and accountants because of his business dealings. Erin had dropped out of high school in the eleventh grade, and had no work or business experience aside from several low level jobs. Throughout their relationship and marriage, Erin had almost no involvement in or understanding of John's business.

John had previously been married to Kathryn C. Hollett, with whom he had five children. Under the terms of their divorce, John owed Kathryn a substantial property settlement, and still owed her millions of dollars at the time of his death. Erin was unaware of this property settlement.

In 1988, the same year that John and Erin became engaged, Erin found a newspaper article about prenuptial agreements that John had left on the kitchen counter. When Erin confronted John with the article, he explained that his first wife had given it to him, and stated that he would not get married without a prenuptial agreement. This statement provoked a "heated and unpleasant" discussion during which Erin said she would not sign such an agreement, particularly because John's first wife had insisted upon it. John said nothing to Erin about a prenuptial agreement again until several days before the August 18, 1990 wedding.

In May 1990, apparently in anticipation of the impending marriage, John sent a statement of his net worth to his attorneys in the law firm of McLane, Graf, Raulerson, and Middleton. After meeting with John on July 18, 1990, his lawyers drafted a prenuptial agreement that was sent to him on July 26. Erin testified that she did not learn about the agreement until the evening of August 16, less than forty-eight hours before the wedding. Under the original draft, Erin was to renounce any claim to alimony or a

property settlement in the event of a divorce, and would receive only $25,000 and an automobile.

Several days before the wedding, John's lawyers contacted Brian Shaughnessy, a recent law school graduate, and requested that he counsel Erin regarding the prenuptial agreement. The lawyers told Shaughnessy that John would pay his fee. Shaughnessy first called Erin on August 16 to obtain her consent to act as counsel and to set up a meeting at the McLane law firm office the next day. Shaughnessy had never before negotiated a prenuptial agreement, but prior to the meeting he studied the law of prenuptial agreements and reviewed the draft agreement.

Erin, accompanied by her mother, met with Shaughnessy in person for the first and only time at the McLane law firm on August 17, the day before the wedding. At that time, all of the plans and arrangements for the elaborate wedding, at which over 200 guests were expected, had already been made and paid for; Erin's mother and father had already flown in from Thailand. During the meeting and subsequent negotiations with John's attorneys, Shaughnessy noted that Erin was under considerable emotional distress, sobbing throughout the three or four hours he was with her and at times so distressed that he was unable to speak with her. Erin testified that she remembered almost nothing about the conference. Shaughnessy, however, testified that he carefully reviewed John's financial disclosure and draft of the agreement with Erin, explained their legal significance, and asked her what she sought to obtain from the agreement. He testified that he advised her that the settlement offer in the draft was inadequate, and reminded her that the wedding could be put off if necessary.

Shaughnessy also testified that he believed the financial disclosure provided by John, which had not been audited or reviewed by any other party, was inadequate. Shaughnessy, however, had no time to independently verify any of John's finances. In any case, he believed that any failure to disclose was John's problem, as it could lead to the invalidation of the agreement.

At the end of the negotiations, the prenuptial agreement was considerably more favorable to Erin, allowing her to obtain as much as one-sixth of John's estate in the event of a divorce or John's death. John's lawyers prepared a final version of the agreement, which John and Erin signed on the morning of August 18, the day of their wedding.

The parties remained married until John's death on April 30, 2001. John was survived by Erin, his first wife, and his children from his first marriage. Erin subsequently petitioned the probate court to invalidate the prenuptial agreement, while John's first wife and children argued in favor

of upholding it. After four days of hearings, the probate court concluded that the prenuptial agreement was valid and enforceable.

On appeal, Erin argues that the prenuptial agreement was invalid for three reasons: (1) the agreement was not voluntary because it was the product of duress and undue influence; (2) John's financial disclosures were inadequate; and (3) she did not have independent counsel. We need only address the issue of duress. We will defer to the findings of fact made by the probate court unless "they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (1997); *In re Jesse F.*, 143 N.H. 192, 193-94 (1998). Although whether duress exists in a particular case is normally a question of fact, it becomes a question of law when only one valid inference can be drawn from the undisputed facts. *See Faske v. Gershman*, 215 N.Y.S.2d 144, 148-49 (Sup. Ct. 1961); 25 AM. JUR. 2D *Duress and Undue Influence* § 29, at 542-43 (1996). We review questions of law *de novo*. *See Duffy v. City of Dover*, 149 N.H. 178, 181 (2003).

■ RSA 460:2-a (1997) permits a man and a woman to enter into a written contract "in contemplation of marriage." A prenuptial agreement is presumed valid unless the party seeking the invalidation of the agreement proves that: (1) the agreement was obtained through fraud, duress or mistake, or through misrepresentation or nondisclosure of a material fact; (2) the agreement is unconscionable; or (3) the facts and circumstances have so changed since the agreement was executed as to make the agreement unenforceable. *See In the Matter of Yannalfo and Yannalfo*, 147 N.H. 597, 599 (2002).

■ "As a practical matter, the claim of undue duress is essentially a claim that the agreement was not signed voluntarily." 3 C. DOUGLAS, NEW HAMPSHIRE PRACTICE, FAMILY LAW § 1.05, at 12 (2002). To establish duress, a party must ordinarily "show that it involuntarily accepted the other party's terms, that the coercive circumstances were the result of the other party's acts, that the other party exerted pressure wrongfully, and that under the circumstances the party had no alternative but to accept the terms set out by the other party." *Yannalfo*, 147 N.H. at 599. However, "the State has a special interest in the subject matter" of prenuptial agreements and "courts tend to scrutinize [them] more closely than ordinary commercial contracts." *MacFarlane v. Rich (MacFarlane)*, 132 N.H. 608, 613 (1989). Moreover, because such agreements often involve persons in a confidential relationship, "the parties must exercise the highest degree of good faith, candor and sincerity in all matters bearing on the terms and execution of the proposed agreement, with *fairness* being

the ultimate measure." *Lutgert v. Lutgert*, 338 So. 2d 1111, 1115 (Fla. Dist. Ct. App. 1976), *cert. denied*, 367 So. 2d 1125 (Fla. 1979); *see also In re Marriage of Matson*, 705 P.2d 817, 818 (Wash. Ct. App. 1985), *aff'd* 730 P.2d 668 (Wash. 1986).

 Under the heightened scrutiny afforded to prenuptial agreements, the timing of the agreement is of paramount importance in assessing whether it was voluntary. *See* 2 A. LINDEY & L. PARLEY, LINDEY AND PARLEY ON SEPARATION AGREEMENTS AND ANTENUPTIAL CONTRACTS § 110.65[2] (2d ed. 2003). Fairness demands that the party presented with the agreement have "an opportunity to seek independent advice and a reasonable time to reflect on the proposed terms." *Lutgert*, 338 So. 2d at 1116. To avoid invalidation on grounds of involuntariness, it has been recommended that "[t]he contract should be presented well in advance of the ceremony, usually thirty days." 3 C. DOUGLAS, NEW HAMPSHIRE PRACTICE, FAMILY LAW § 1.05, at 13. Some States, in fact, automatically invalidate any prenuptial agreement signed immediately before a wedding. *See, e.g.*, Minn. Stat. § 519.11 (2002) (agreement "must be entered into and executed prior to the day of solemnization of marriage").

In arguing for the validity of the Holletts' agreement, the respondents rely upon *In the Matter of Yannalfo and Yannalfo*, 147 N.H. 597 (2002). In that case, the husband and wife, each of whom was employed by the United States Postal Service, signed a prenuptial agreement a "day or so" before their wedding. *Yannalfo*, 147 N.H. at 598. The agreement was limited to a house that the husband and wife had purchased one month before the wedding, for which the husband had contributed $70,000 as a down payment, and the wife had provided $5,000 for closing costs. *Id.* The agreement stated that the first $70,000 of equity in the house was the property of the husband, and that in the event of a divorce, the house would be sold and $70,000 would be paid to the husband. *Id.* The agreement did not concern any property other than the $70,000 contribution. *Id.*

In upholding the agreement in *Yannalfo*, we rejected a *per se* invalidation of agreements signed immediately before the wedding. *Id.* at 599. Instead, we established that each case must be decided upon the totality of its own circumstances. *Id.* at 599-600. Citing cases from other jurisdictions, however, we suggested that "additional circumstances coupled with [such] timing" may compel a finding that a prenuptial agreement was involuntary. *Id.*

Several important circumstances distinguish the present case from *Yannalfo*. First, the agreement in *Yannalfo* did not involve the entire estates of the parties. Rather, it only concerned money used in a

transaction that both parties had participated in one month before the wedding. *Id.* at 598. The agreement in this case, by contrast, involves the post-marriage disbursement of an estate that totaled over six million dollars at the time of the agreement, and the relinquishment of marital rights such as alimony. Such a complicated and important agreement will require more time for negotiation and reflection than the agreement in *Yannalfo*.

Second, unlike the parties in *Yannalfo*, Erin's bargaining position was vastly inferior to that of her husband. John was much older than Erin, and he had already been married. According to their financial disclosures, John had approximately six million dollars in assets, while Erin owned approximately five thousand dollars worth of personal property at the time of the agreement. Erin's work experience during the relationship was limited to stints as a bartender and a grocery store cashier. She had little understanding of and no real involvement in John's business ventures. According to Erin, in fact, John had encouraged Erin to stop working after they began their relationship. If Erin refused to sign the agreement, she thus not only stood to face the embarrassment of canceling a two hundred guest wedding, but also stood to lose her means of support. Prenuptial agreements that result from such a vast disparity in bargaining power must meet a high standard of procedural fairness. *Cf. Yannalfo* 147 N.H. at 600; *Lutgert*, 338 So. 2d at 1115.

Finally, John's conduct before the wedding raises serious questions regarding his good faith in dealing with Erin. John had contemplated a prenuptial agreement at least two years before the wedding, as evidenced by his argument with Erin in 1988. Despite Erin's opposition to the idea, however, he did not discuss the agreement with her again. Moreover, although John's lawyers had drafted a prenuptial agreement almost a month before the wedding, John did not obtain counsel for his wife or even inform her of the agreement until several days before the ceremony. In other words, despite having every opportunity to negotiate the agreement well before the wedding, John elected to conduct his affairs so that Erin had no time to choose her own counsel, and very little time to negotiate and reflect upon the agreement.

In upholding the agreement, the trial court cited as a factor in its reasoning Erin's failure to "repudiate or rescind" the agreement during her ten years of marriage to John. Public policy, however, limits the consideration of such evidence. As one court has stated:

> The law frowns upon litigation between husband and wife. Where their relations are friendly and affectionate, it takes account of the fact that she would be loath to institute legal proceedings

against him. . . . [A]ny other policy would be apt to beget disagreements and contentions in the family fatal to domestic peace.

*In re Flannery's Estate*, 173 A. 303, 304 (Pa. 1934). The *Flannery* court thus declined to permit a laches defense in a case where the wife challenged a prenuptial agreement after her husband's death. *Id.* The same logic precludes us from considering the wife's delay in challenging the agreement as substantive evidence of the agreement's voluntariness or ratification. To hold otherwise would be to penalize Erin for choosing not to disrupt her marriage, which the trial court characterized as "close," "loving" and "traditional," with a lawsuit against her husband.

Finally, the trial court focused upon the assistance Erin received from Brian Shaughnessy before the execution of the agreement. The respondents, in fact, suggest that the presence of counsel should be dispositive of the issue of voluntariness. We note that the trial court itself found that the time constraints limited the quality of Shaughnessy's representation: for example, he was unable to verify the accuracy of John's disclosures. Even assuming, however, that Shaughnessy provided Erin with effective independent counsel, and that the financial representations upon which he relied were accurate, we cannot agree that his counsel by itself was sufficient to validate this agreement.

Independent counsel is useless without the ability and the time to make effective use of such counsel. As one commentator has stated:

> [M]ore recent and enlightened cases have held that the dependent party must be given *sufficient time* to obtain the advice of independent counsel. . . . The contract should be presented well in advance of the ceremony, usually thirty days, to allow the bride or groom a *reasonable opportunity* to consult with independent counsel.

3 C. Douglas, New Hampshire Practice, Family Law § 1.05, at 13 (emphasis added).

■ In this case, it would be unreasonable to conclude that Erin had "sufficient time" or a "reasonable opportunity" to make use of Brian Shaughnessy's advice. Given the complexity of John's finances and the agreement, and the disparity in the parties' bargaining power, Erin needed more than one day to negotiate and reflect upon his draft proposal. Without such time, we conclude as a matter of law that her signing of the agreement was involuntary under the heightened standard applied to

prenuptial agreements. *See Matson*, 705 P.2d at 820-21; *Lutgert*, 338 So. 2d at 1115-17.

*Reversed and remanded.*

NADEAU and DALIANIS, JJ., concurred.