Hillsborough-southern judicial district
No. 2005-634

IN THE MATTER OF JENNIFER SARVELA AND BRIAN D. SARVELA

Argued: September 13, 2006
Opinion Issued: November 29, 2006

*Wiggin & Nourie, P.A.*, of Manchester (*Doreen F. Connor* on the brief and orally), for the petitioner.

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the respondent.

DALIANIS, J. The petitioner, Jennifer Sarvela, appeals and the respondent, Brian D. Sarvela, cross-appeals the final decree entered by the Superior Court (*Abramson*, J.) in the parties' divorce. The petitioner challenges the trial court's equitable distribution of the parties' assets and its failure to award her a fault-based divorce. The respondent also contests the trial court's equitable distribution of assets and disputes the court's calculation of his child support obligation. We affirm in part, vacate in part and remand.

The following facts either appear in the record or are undisputed on appeal. The parties married in August 1998 and have two children. Approximately five years after they married, the petitioner filed for divorce, alleging the fault ground of habitual drunkenness because of the respondent's abuse of prescription drugs. *See* RSA 458:7, VII (2004). Following a two-day hearing, the trial court denied the petitioner's request for a fault-based divorce, and granted the parties a divorce on the grounds of irreconcilable differences leading to the irremediable breakdown of the marriage. RSA 458:7-a (2004).

The trial court determined that a nearly equal distribution of assets was equitable. Although the court awarded the marital home to the petitioner, it required her to pay the respondent fifty percent of the equity in the home, less $10,000, which the court found she invested in the home from her own funds before the marriage. The court ordered that the respondent's share of equity in the marital home be placed in an escrow account to secure child support payments. In addition, the court issued a uniform support order. Based upon its finding that the respondent was voluntarily underemployed, the court imputed income of $72,449 per year to him to calculate his child support obligation.

In her appeal, the petitioner argues that the trial court erred when it: (1) failed to award her a fault-based divorce based upon the respondent's prescription drug abuse during the marriage; and (2) awarded the parties a near equal distribution of the marital assets when the marriage lasted only five years and was thus, in the words of the court, "short term." In his cross-appeal, the respondent contends that the trial court erroneously: (1) found that he was voluntarily underemployed; (2) imputed income to him based upon what he earned in 2003, two years before the divorce hearing;

(3) ordered him to place his share of the proceeds from the sale of the marital home in an escrow account absent evidence of egregious nonpayment of child support; and (4) did not award him a "[m]ore [e]ven [h]alf" of the marital estate. We first address the petitioner's appeal.

## I. Petitioner's Appeal

### A. Fault-Based Divorce

The trial court ruled that the petitioner was not entitled to a divorce based upon the fault ground of habitual drunkenness because: (1) the term "habitual drunkenness" means "habitual excessive use of alcohol"; and (2) there was insufficient evidence that the respondent's use of alcohol led to the breakdown of the marriage. See RSA 458:7, VII. The court rejected the petitioner's assertion that the respondent's abuse of prescription drugs constituted habitual drunkenness.

The petitioner argues that the trial court erred by limiting the term "habitual drunkenness" to intoxication by alcohol. She asserts that the plain language of RSA 458:7, VII refers to "an habitual drunkard," and that a drunkard is one who is "intoxicated." She contends that the respondent became "intoxicated" when he ingested prescription drugs and, therefore, he was "an habitual drunkard" under the statute.

Resolving this issue requires that we interpret RSA 458:7, VII, which permits a party to obtain a fault-based divorce "[w]hen either party is an habitual drunkard, and has been such for 2 years together." The interpretation of a statute is a question of law, which we review de novo. Kenison v. Dubois, 152 N.H. 448, 451 (2005). We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. Id. We first examine the language of the statute, and, where possible, we ascribe the plain and ordinary meanings to the words used. Id. When the language of a statute is clear on its face, its meaning is not subject to modification. Dalton Hydro v. Town of Dalton, 153 N.H. 75, 78 (2005). We will neither consider what the legislature might have said nor add words that it did not see fit to include. Id.

The plain meaning of "drunkard" is "one who habitually becomes drunk[;] one suffering from or subject to acute or chronic alcoholism." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 696 (unabridged ed. 2002). To be "drunk" is to be "in a condition caused by alcoholic drink in which control of the faculties is impaired and inhibitions are broken and in later stages of which one tends toward or reaches insensibility." Id. These definitions do not encompass one who habitually abuses or is impaired because of prescription drugs.

■ "We also note that a law means what it meant to its framers and its mere repassage does not alter that meaning." *In the Matter of Blanchflower & Blanchflower*, 150 N.H. 226, 227 (2003) (quotation and brackets omitted). The provision now codified as RSA 458:7 first appeared in the Revised Statutes of 1842. *Id.* at 227-28; *see* RS 148:3 (1842). The statute did not define the word "drunkard"; however, a dictionary from that time defined the word "drunkard" as "[o]ne addicted to drunkenness" and the word "drunken" as "[i]ntoxicated with liquor." J. WORCESTER, A UNIVERSAL AND CRITICAL DICTIONARY OF THE ENGLISH LANGUAGE 227 (1846). Based upon the foregoing, we conclude that the phrase "habitual drunkard" does not refer to one who habitually abuses prescription drugs.

## B. Equitable Division of Assets

In dividing the parties' assets, the court enforced their partial permanent stipulation with respect to motor vehicles, health insurance, life insurance, charges against the estate and allocation of debt. The court awarded the parties the personal property in their possession. The court awarded the marital residence to the petitioner, but required her to pay the respondent fifty percent of the equity in the home, less $10,000. The court ordered the petitioner to refinance the house within one year of the decree to remove the respondent from the note and mortgage. Additionally, the court ordered that the proceeds from the sale of the parties' Vermont home be divided equally.

The petitioner asserts that because the parties had a short-term marriage, and because she brought more assets into the marriage than did the respondent, she was entitled to a greater share of the parties' assets upon divorce. She contends that, in a short-term marriage, the trial court was, in effect, required to return the parties to their premarital financial positions. She argues that the *only* circumstances under which a trial court may not return the parties in a short-term marriage to the financial positions they held before marriage "is when the party without the premarital assets leaves the ... marriage with physical custodial responsibilities." We disagree.

"RSA 458:16-a, II creates a presumption that equal distribution of marital property is equitable." *In the Matter of Watterworth & Watterworth*, 149 N.H. 442, 453 (2003) (quotation and ellipsis omitted). Absent special circumstances, the court must make the distribution as equal as possible. *Id.* "The statute enumerates various factors for the court to consider, such as the length of the marriage, the ability of the parties to provide for their own needs, the needs of the custodial parent, the contribution of each party during the marriage and the value of property contributed by each party." *In the Matter of Crowe & Crowe*, 148 N.H. 218,

221 (2002); *see* RSA 458:16-a, II (2004). Additionally, the court may consider any other factor it deems relevant in equitably distributing the parties' assets. RSA 458:16-a, II(o).

█ The petitioner misinterprets the pertinent case law. In *Rahn v. Rahn*, 123 N.H. 222, 225 (1983), we observed: "A marriage of only one or two years may be considered differently than a long-term marriage of ten, twenty, or thirty years. In a short-term marriage, it is easier to give back property brought to the marriage and still leave the parties in no worse position than they were in prior to it." This language does not *require* trial courts to return the parties in a short-term marriage to their premarital financial positions. Nor does our decision in *Crowe*, 148 N.H. at 222, *require* trial courts to award more assets to the party who came into a short-term marriage with fewer assets because that party has primary child care responsibilities.

The trial court's statutory obligation is to apportion the property equitably. "In a divorce proceeding, marital property is not to be divided by some mechanical formula but in a manner deemed 'just' based upon the evidence presented and the equities of the case." *In the Matter of Letendre & Letendre*, 149 N.H. 31, 35 (2002). The duration of a marriage is but *one* of the factors for a court to consider when equitably dividing the parties' property. *See Crowe*, 148 N.H. at 221. Under the statute, the court must "presume that an equal division is an equitable division of property, unless ... [it] decides that an equal distribution of property would not be appropriate or equitable after considering *one or more* of the following factors." RSA 458:16-a, II (emphasis added). The court need not consider all of the enumerated factors or give them equal weight. *Watterworth*, 149 N.H. at 453.

█ Contrary to the petitioner's implied assertion, RSA 458:16-a, I (2004) makes no distinction between property brought to the marriage by the parties and that acquired during marriage, and does not exclude property given to one spouse during the course of the marriage. *In the Matter of Harvey & Harvey*, 153 N.H. 425, 438 (2006). Regardless of the source, all property owned by each spouse at the time of divorce is to be included in the marital estate. *Id.* While the court has discretion to consider when and by whom property was acquired in determining its distribution, the relevant statutory scheme "does not classify property based upon when or by whom it was acquired, but rather assumes that all property is susceptible to division." *Crowe*, 148 N.H. at 221.

The petitioner also contends that the trial court should have given her "credit" for contributing $91,024 from her own or her family's assets to the marital estate. The record does not support this contention. Among other

things, contrary to the petitioner's assertions, the court found that her family gave *each* party $20,000, and gave an additional $18,000 to the parties jointly, not to her alone. The record supports these findings. Further, although the trial court did not find this specifically, the petitioner testified that while she liquidated some of her Exxon stock to fund the construction of the marital home, the remaining stock increased in value during the marriage from $5,000 to $25,000. The petitioner also testified that she received the settlement of her sexual harassment suit after the parties were married, not before.

■ The petitioner next argues that the trial court failed to consider the statutory factors in dividing the parties' assets. To the contrary, the record demonstrates that the court considered: (1) the duration of the marriage; (2) the employability of the parties; (3) the ability of the petitioner, as the custodial parent, to engage in gainful employment without substantially interfering with the interests of the parties' children; (4) the need of the custodial parent to occupy the marital home; (5) the expectation of pension or retirement rights acquired prior to or during the marriage; (6) the value of any property acquired before the marriage; and (7) the value of any property acquired by gift. *See* RSA 458:16-a, II(a), (b), (d), (e), (i) (m), (n). In considering these factors, the court found that it was equitable to divide the marital estate relatively equally. As the record shows that the trial court considered the relevant statutory factors and as it supports the court's factual findings based upon these factors, we cannot say that the court's near equal division of assets was so inequitable as to constitute an unsustainable exercise of discretion. *See Watterworth*, 149 N.H. at 453.

The petitioner next asserts that the trial court failed to explain the basis for its "nearly equal division" of property. As she correctly observes, RSA 458:16-a, IV (2004) requires the trial court to "specify written reasons for the division of property which it orders." We hold that the trial court complied with this requirement.

In *Magrauth v. Magrauth*, 136 N.H. 757, 763 (1993), we explained that "if the superior court determines that an equal division is equitable, and the parties have not requested findings and rulings . . ., it need only state that, after considering the relevant factors enumerated in RSA 458:16-a, II, it has decided to make an equal division which is presumptively equitable under the statute." Where, as here, the parties have made specific requests for findings and rulings, "the court should state its reasons and make specific findings and rulings supporting its decision, regardless of whether it decides to make an equal or unequal distribution of the property." *Magrauth*, 136 N.H. at 763. The trial court need not "specify written reasons using the factors listed in the statute," however,

unless it "concludes that an unequal distribution of property is warranted." *Id.*

■ In this case, as the petitioner observes, the trial court chose to divide the parties' property "equally, with the exception of a $10,000.00 credit for [her] premarital assets." As the court stated, "absent special circumstances," its obligation was to "make property distribution as equal as it can." In addition, the court ruled upon the parties' specific requests for findings and rulings. By statute, the court's near equal division of property was presumptively equitable. *See* RSA 458:16-a, II. The court thus complied with its statutory obligation to specify written reasons for the distribution it ordered. *See* RSA 458:16-a, IV; *see also Magrauth*, 136 N.H. at 763.

■ Moreover, to the extent that the trial court's division of property may have been unequal because the court awarded the petitioner an additional $10,000 in the equity of the marital home, we hold that the court complied with its statutory obligation to specify its reasons for doing this. *See* RSA 458:16-a, IV. The court found that, before the parties married, the petitioner invested $10,000 of her own funds in the marital home. Citing RSA 458:16-a, II(o), the court deemed it equitable to return this money to the petitioner.

## II. Respondent's Cross-Appeal

### A. Equitable Division of Assets

The respondent first argues that the trial court erred when it found that he "agreed to waive his claim to [the] petitioner's stock in return for her agreement not to pursue his Rock 101 401(k) account." The respondent contends that this finding is based upon "no evidence." The trial transcript refutes this assertion.

At trial, the petitioner offered to play a tape of a discussion between the parties in which she agreed "to sign off on a 401K that [the respondent] has and he said Jennifer, I will relinquish my rights, any rights I may have to your stock and your 401k." The petitioner asserted that because of the respondent's offer to "sign off on her stock[,] she signed off on Valentine's Day of 2005 on his 401k." The trial court ruled that it would accept these assertions unless the respondent disputed them. If the respondent disputed them, the court would allow the tape to be played in rebuttal. The respondent told the court that it was unnecessary to play the tape. To the extent that the respondent now disputes the petitioner's version of the parties' conversation, he has failed to demonstrate that he preserved this

argument for our review. *See Bean v. Red Oak Prop. Mgmt.*, 151 N.H. 248, 250 (2004).

The respondent next asserts that the trial court erred when it awarded each party the personal effects in their possession. He contends, "While that might sound fair, [the respondent] had virtually no personal[]ty in his possession .... [He] was reduced to not even having pots and pans." The petitioner testified, however, that the respondent took approximately $60,000 worth of personal property from the marital home after she filed for divorce. Having found the respondent to be one of the "least credible witnesses" the trial court had ever encountered, the court was entitled to disregard his testimony on this subject. *See Cook v. Sullivan*, 149 N.H. 774, 780 (2003) (court defers to trial court's judgment on such issues as resolving conflicts in testimony, measuring credibility of witnesses, and determining weight to be given evidence).

## B. Child Support Calculation

### 1. Voluntary Underemployment

The respondent contends that the trial court erred when it imputed income to him for child support purposes after finding that he was voluntarily underemployed. The trial court found that the respondent was voluntarily underemployed because: (1) he was "fired from a series of well-paying jobs as a result of his drug abuse"; and (2) "he walked away from employment compensating him at the rate of $52,000 a year." *See* RSA 458-C:2, IV(a) (2004). The respondent first argues that the evidence does not support these findings. We disagree.

In addition to the petitioner's testimony that the respondent was fired from radio station WLNH, the record demonstrates that the respondent was also fired from radio station WKXL in April 2004, after the station received complaints that he was obviously drunk or medicated at client meetings. One complainant told the station that the respondent "was nodding off during his sales call [and] was drooling." The record further showed that the respondent was fired from radio station WNNH in January 2004 because of his "pattern of poor service, dishonesty, and losing clients for the station" due to prescription drug abuse. This evidence supports the trial court's finding that the respondent was fired from several jobs because of his prescription drug abuse.

There was evidence in the record as well to support the trial court's finding that the respondent "walked away" from employment for which he received an annual salary of $52,000. The respondent testified that before his current employment, he worked for two radio stations, WNEX in Rochester and another station in Nashua. When he worked for these

stations, he earned approximately $1,000 per week. He testified that he left these positions in October, "when I came back from Vermont and I lost everything I ever dreamed of and just didn't go back to work, I didn't even feel like it was worth it at the time." He also testified that he did not resume working in the radio industry until the end of January 2005. Based upon this testimony, the trial court reasonably could have found that the respondent "walked away" from the Rochester and Nashua radio positions.

The respondent next asserts that because he did not intend to lose his jobs, his alleged underemployment was not "voluntary." RSA 458-C:2, IV(a) authorizes "[t]he court, in its discretion, [to] consider as gross income the difference between the amount a parent is earning and the amount a parent has earned in cases where the parent voluntarily becomes unemployed or underemployed, unless the parent is physically or mentally incapacitated." We have held that this statute "permit[s], rather than require[s] a court to impute income based upon a voluntarily unemployed or underemployed parent's prior earnings." *In the Matter of Bazemore & Jack*, 153 N.H. 351, 355-56 (2006). "Whether a party is underemployed is a question for the fact finder, whose decision will not be disturbed on appeal if supported by evidence in the record." *In the Matter of Donovan & Donovan*, 152 N.H. 55, 58-59 (2005).

In finding that the respondent was voluntarily underemployed and in imputing income to him based upon this finding, the trial court relied upon our decision in *Noddin v. Noddin*, 123 N.H. 73 (1983). In that case, we held that, in the context of a post-divorce request for modification of an existing child support order, the child support obligation should not be reduced where the obligor's wrongdoing resulted in the loss of high-earning employment and the obligor owned an asset that could be applied to meet his or her obligations. *Noddin*, 123 N.H. at 76. In *In the Matter of Rossino & Rossino*, 153 N.H. 367, 370 (2006), we recently clarified that RSA 458-C:2, IV(a) supersedes our decision in *Noddin*.

In *Rossino*, the obligor moved to modify his child support obligation after his annual income was reduced because he involuntarily resigned from his employment with the Hudson Police Department and, thereafter, while working as an electrician's apprentice, was electrocuted. *Rossino*, 153 N.H. at 368-69. Applying *Noddin*, the trial court attributed the higher earnings from the Hudson Police Department to the obligor. *Id.* at 369. Specifically the court found that "it was a result of [the obligor's] own inappropriate conduct and voluntary actions that brought about his loss of employment with the Hudson Police Department." *Id.* We held that the court erred when it ruled that *Noddin* applied and imputed the obligor's

higher earnings as a police officer to him without first determining whether the obligor was physically or mentally incapacitated. *Id.* at 370-71. We noted that were we to conclude that *Noddin* survived the enactment of RSA 458-C:2, IV(a), we "would circumvent the stated purpose of RSA chapter 458-C to establish uniformity in child support determinations and modifications." *Id.* at 370.

In this case, to the extent that the trial court found the respondent to be voluntarily underemployed because he lost his job(s) due to his own wrongdoing, we hold that it erred as a matter of law. RSA 458-C:2, IV(a) permits a trial court to impute income to a parent who "voluntarily" becomes unemployed or underemployed. A parent who is involuntarily terminated from his or her employment, or, as in the case of the obligor in *Rossino*, 153 N.H. at 368, involuntarily resigns from that employment, did not "voluntarily" become unemployed or underemployed. Our task is to interpret legislative intent from the statute as written. *Donovan*, 152 N.H. at 58. We will not consider what the legislature might have said or add words that the legislature did not see fit to include. *Id.* Accordingly, we will not graft *Noddin* onto the statutory scheme as written. We leave to the legislature to decide whether to revive *Noddin* by amending RSA 458-C:2, IV(a).

We therefore vacate the trial court's finding that the respondent was voluntarily underemployed and its decision to impute income to him, to the extent that the court did so because it found that he was fired from several jobs. We remand for further proceedings consistent with this opinion and with our decision in *Rossino*.

### 2. Escrow Account

Finally, the respondent argues that the court erred when it ordered that his share of the proceeds of the marital home be held in escrow until he "is compensated at the level of his previous employment and is able to pay [the] petitioner the amount of child support he owes under the Guidelines." *See* RSA 458:21 (2004). While the respondent concedes that "[t]rial courts clearly have the authority to provide for security for the payment of child support," he asserts that such security "is restricted to those cases where there has been egregious non-payment, or misleading reporting of substantial amounts of income." (Citations omitted.) He contends, "[T]here is no basis for the escrow the court required here."

RSA 458:21 authorizes the trial court, in its discretion, to require security for payment of child support "[i]n all cases where alimony or an allowance shall be decreed for a spouse or children." *See In the Matter of*

*Feddersen & Cannon,* 149 N.H. 194, 200-01 (2003). Although the respondent argues that the court may exercise its discretion in this regard only "where there has been egregious non-payment, or misleading reporting of substantial amounts of income," RSA 458:21 contains no such limitation. *Id.* at 201.

▉ In this case, the trial court required the escrow after finding that the respondent had "presented no persuasive evidence that he is not still abusing prescription drugs. . . . As such, given the history of the case, and [his] demeanor and attitude at trial, the Court is not persuaded he will pay as ordered." In light of this finding, we cannot conclude that the trial court unsustainably exercised its discretion by ordering that the respondent's share of the proceeds of the marital home be held in escrow to secure child support payments.

*Affirmed in part; vacated in part; and remanded.*

BRODERICK, C.J., and DUGGAN and GALWAY, JJ., concurred.