# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2014-0816, <u>In the Matter of Richard Calvin and Connie Calvin</u>, the court on January 11, 2016, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. We affirm in part, vacate in part, and remand.

The petitioner, Richard Calvin, appeals the invalidation of his prenuptial agreement by the Circuit Court (<u>Cooper</u>, M., approved by <u>Gordon</u>, J.) and the final decree issued by that court (<u>Geiger</u>, M., approved by <u>Leonard</u>, J.) in his divorce from the respondent, Connie Calvin, now Connie Lorette. He contends that the trial court erred by: (1) invalidating the parties' prenuptial agreement solely on the grounds of timing; (2) inequitably distributing the marital estate by failing to award him certain pre-marital assets that he did not commit to the marriage; (3) improperly valuing his dental practice; and (4) identifying a loan he made to his business as a marital asset subject to distribution.

I

We first address the petitioner's argument that the trial court erred as a matter of law by invalidating the parties' prenuptial agreement on duress grounds based solely upon the date that the final draft was executed. He contends that there were "no additional aggravating factors, which when combined with the timing of the agreement's execution, created a situation of undue influence or duress."

"We will defer to the findings of fact made by the [trial] court unless they are so plainly erroneous that such findings could not be reasonably made." <u>In re Estate of Hollett</u>, 150 N.H. 39, 42 (2003) (quotation omitted). RSA 460:2-a (2004) permits parties to enter into a written contract "in contemplation of marriage." A prenuptial agreement is presumed valid unless the party seeking the invalidation of the agreement proves that: (1) the agreement was obtained through fraud, duress or mistake, or through misrepresentation or nondisclosure of a material fact; (2) the agreement is unconscionable; or (3) the facts and circumstances have so changed since the agreement was executed as to make the agreement unenforceable. <u>Id</u>.

"As a practical matter, the claim of undue duress is essentially a claim that the agreement was not signed voluntarily." <u>Id</u>. (quotation omitted). To

establish duress, a party must ordinarily show that it "involuntarily accepted the other party's terms, that the coercive circumstances were the result of the other party's acts, that the other party exerted pressure wrongfully, and that under the circumstances the party had no alternative but to accept the terms set out by the other party." Id. (quotation omitted). "However, the State has a special interest in the subject matter of prenuptial agreements and courts tend to scrutinize them more closely than ordinary commercial contracts." Id. (quotations and brackets omitted). "Moreover, because such agreements often involve persons in a confidential relationship, the parties must exercise the highest degree of good faith, candor and sincerity in all matters bearing on the terms and execution of the proposed agreement, with fairness being the ultimate measure." Id. at 42-43 (quotation omitted).

"Under the heightened scrutiny afforded to prenuptial agreements, the timing of the agreement is of paramount importance in assessing whether it was voluntary." Id. at 43. "Fairness demands that the party presented with the agreement have an opportunity to seek independent advice and a reasonable time to reflect on the proposed terms." Id. (quotation omitted). "To avoid invalidation on grounds of involuntariness, it has been recommended that the contract should be presented well in advance of the ceremony, usually thirty days." Id. (quotation and brackets omitted). "Some states, in fact, automatically invalidate any prenuptial agreement signed immediately before a wedding." Id.

"[I]n Yannalfo, [147 N.H. 597 (2002)], we rejected a per se invalidation of agreements signed immediately before the wedding." Hollett, 150 N.H. at 43. "Instead, we established that each case must be decided upon the totality of its own circumstances." Id. "Citing cases from other jurisdictions, however, we suggested that additional circumstances coupled with such timing may compel a finding that a prenuptial agreement was involuntary." Id. (quotation and brackets omitted).

Here, the trial court relied upon various factors to conclude that the prenuptial agreement was the product of duress. First among these was the timing of the agreement. The petitioner had spoken to his attorney concerning a prenuptial agreement in the spring of 1999, at which point he was given a letter that read as follows: "you will then each need to sign this list (of assets) indicating that each of you is aware of everything the other owns and earns going into the marriage and have made a fully informed decision to forego an interest in certain things in consideration of your marriage." Despite the conversation with, and letter from, his attorney in 1999 — neither of which the respondent was made aware of at that time — the petitioner did not inform the respondent that she would be required to sign a prenuptial agreement until September 17, 2000, a week before the wedding. The court stressed that the respondent did not sign the agreement until "a mere five days before the date of the parties' wedding."

The petitioner contends that the trial court should have focused upon the "parties' course of conduct during the 30-40 days preceding the wedding," rather than upon the timing of the document's execution. Although the court noted that discussions about the reality of an agreement and exchange of information "did not commence until the month before the wedding," it concluded that "there is no compelling evidence to suggest that serious and frank discussions regarding material terms of the Agreement ever took place in an environment outside of the moment of the wedding." Given that timing is of paramount importance in assessing the validity of an agreement, see id., it was proper for the court to place great weight on this factor in its decision. Further, because the court is tasked with determining whether the respondent voluntarily entered into or signed the agreement, see id. at 42, it properly narrowed its focus to "the events surrounding the ultimate execution of the document."

The court also focused upon the facts that, at the point at which she was informed of the agreement, the respondent had already "made arrangements, spent money, [and] sent out invitations to friends and most of [her] professional colleagues." The court further emphasized the petitioner's testimony that "he would not have married the Respondent if she had not signed" the agreement. Finally, although the petitioner consulted with an attorney regarding the prenuptial agreement well in advance of the wedding, there is no evidence that the respondent had sufficient time either to seek legal advice or for personal reflection before signing the agreement a "mere five days" before the wedding.

The petitioner also points out that the court generally noted that the parties "had a discussion at various times regarding the Petitioner's desire for the parties to enter into a prenuptial agreement." He argues that such discussions likewise demonstrate that the respondent was not under duress when she signed the agreement. There is a significant difference, however, between a willingness to generally discuss a prenuptial agreement at various points in a relationship and a willingness to sign a specific prenuptial agreement, without advance notice thereof, days before a wedding. See Lutgert v. Lutgert, 338 So. 2d 1111, 1116 (Fla. Dist. Ct. App. 1976) (concluding that husband's statement that his wife was willing to discuss prenuptial agreements generally was insufficient to show that she voluntarily signed the specific prenuptial agreement in question).

Finally, we reject the petitioner's argument that the respondent ratified the agreement by not objecting to it and by acknowledging its existence in her revocable trust agreement. The trial court was not compelled to find that these circumstances demonstrated a ratification of an otherwise invalid agreement. See Hollett, 150 N.H. at 45.

We agree with the trial court that prenuptial "[a]greements between parties are to be negotiated with full disclosure, in good faith, and with

3

sufficient time for each of the parties to reflect on the terms of their prospective agreement and to have the opportunity to conduct meaningful consultation with competent legal counsel." As the court stated, the facts in this case do not show the "type of arm's length, rational, deliberate negotiations process that was contemplated by the makers of RSA 490:2-(a)." It thus concluded that the respondent entered into the prenuptial agreement in "an emotionally overwrought state, and, under duress," and invalidated the agreement. Under the totality of the circumstances, we conclude that the trial court's finding of duress was reasonable and therefore affirm its invalidation of the prenuptial agreement.

II

The petitioner next argues that the trial court's distribution of the marital estate was an unsustainable exercise of discretion because it failed to award him the pre-marital assets that he neither commingled nor committed to the marital purpose. Specifically, he contends that he should have been awarded various financial assets, equity in both a home and a condominium, and his dental practice.

"A trial court has broad discretion in fashioning a final decree of divorce and in managing the proceedings before it." In the Matter of Spenard & Spenard, 167 N.H. 1, 3 (2014) (citations omitted). "We will not overturn a trial court's rulings absent an unsustainable exercise of discretion." Id. "This means that we review the record only to determine whether it contains an objective basis to sustain the trial court's discretionary judgments." Id. (quotation and brackets omitted). "If the court's findings can reasonably be made on the evidence presented, they will stand." Id. (quotation omitted).

"The trial court's statutory obligation is to apportion the property equitably." In the Matter of Sarvela & Sarvela, 154 N.H. 426, 431 (2006). "The court shall presume that an equal division is an equitable distribution of property, unless . . . [it] decides that an equal division would not be appropriate or equitable after considering one or more" enumerated factors. RSA 458:16-a, II (2004). "The court need not consider all of the enumerated factors or give them equal weight," and may also "consider any other factor it deems relevant in equitably distributing the parties' assets." Sarvela, 154 N.H. at 431; see RSA 458:16-a, II(o). Further, "[i]n a divorce proceeding, marital property is not to be divided by some mechanical formula but in a manner deemed 'just' based upon the evidence presented and the equities of the case." Sarvela, 154 N.H. at 431 (quotation omitted).

"Contrary to the petitioner's implied assertion, RSA 458:16-a, I (2004) makes no distinction between property brought to the marriage by the parties and that acquired during marriage, and does not exclude property given to one spouse during the course of the marriage." Sarvela, 154 N.H. at 431.

"Regardless of the source, all property owned by each spouse at the time of divorce is to be included in the marital estate." Id. "While the court has discretion to consider when and by whom property was acquired in determining its distribution, the relevant statutory scheme does not classify property based upon when or by whom it was acquired, but rather assumes that all property is susceptible to division." Id. (quotation omitted).

Here, the trial court stated that it would "consider the property that the parties had acquired prior to the marriage," but not the unenforceable prenuptial agreement, when distributing the property. The court determined that all the property before it, as defined by RSA 458:16-a, I — save the petitioner's inheritance — was part of the marital estate, resulting in $3,093,608 in total assets to be divided.

The court concluded that, because the parties' marriage was not short term, it would not put the parties back in the position they were in prior to the marriage. See In the Matter of Hampers & Hampers, 154 N.H. 275, 286 (2006). In addition to the length of the marriage, the court considered many of the factors enumerated in RSA 458:16-a, II, including that: (1) the petitioner "has a significantly higher income and greater ability to acquire income and assets in the future"; (2) the petitioner's high income "should be even higher as he reduces his debt"; (3) although the respondent "should also be able to work towards acquiring assets in the future, [it would not be] at the same level" as the petitioner; (4) "both parties contributed to the growth of the assets and property owned by either or both parties during the marriage" and both worked "very hard during the marriage"; (5) "[b]oth parties contributed to the care of the household and [that] there is no significant disparity relative to their contributions"; (6) the court would not penalize the respondent "because she made less money, or because of her decision to pursue her education," which the petitioner supported, and which made alimony unnecessary; and (7) while the petitioner paid more of the household expenses while the respondent was a student, and helped to pay off her student loans, the respondent "was always employed and contributing financially to the marriage."

After considering and weighing the relevant statutory factors, the court found that a 60%-40% split was "an equitable division." Thus, the petitioner was awarded $1,856,165 and the respondent was awarded $1,237,443. Given that numerous statutory factors support the court's unequal property distribution, we reject the petitioner's argument that the court did not discuss relevant statutory authority in reaching its decision. See id. (emphasizing that "marital property is not to be divided by some mechanical formula but in a manner deemed 'just'" (quotation omitted) and that "[t]he court need not consider all of the enumerated factors or give them equal weight"). We further reject the petitioner's contention that the court should have discussed New Hampshire case law in its divorce decree because, in light of the court's statutory analysis, such additional discussion was unnecessary. Accordingly,

we cannot conclude that the court did not equitably divide the marital estate based upon the evidence presented and the equities of the case.

III

The petitioner argues that the court unsustainably exercised its discretion by valuing his dental practice at $700,000, which he contends did not properly consider the debt of the practice. We disagree.

RSA 458:16-a, I, defines the property subject to division in a divorce as "all tangible and intangible property and assets, real or personal, belonging to either or both parties, whether title to the property is held in the name of either or both parties." We have previously defined the fair market value of property "as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." In the Matter of Watterworth & Watterworth, 149 N.H. 442, 447 (2003) (quotation omitted). "The valuation of a professional practice is a question of fact to be determined by the trial court based upon the particular facts and circumstances." In the Matter of Cottrell & El-Sherif, 163 N.H. 747, 749 (2012). "We will not disturb the trial court's findings in this regard unless they are unsustainable on the record." Id.

The court heard testimony from two experts regarding the fair market value of the dental practice. Anthony Albright, the respondent's expert, used the capitalization of earnings method to determine a fair market value for the practice of $743,000. "This method involves first valuing the tangible assets of the subject enterprise, then adding a value for goodwill by capitalizing any earnings in excess of a reasonable return on the tangible assets." Watterworth, 149 N.H. at 447 (quotation omitted). The approach compares "the average income of the subject professional to the average income of a salaried professional with equivalent education, experience, skill, etc.," and then makes necessary adjustments to arrive at a fair return on the subject professional's invested capital in the practice. Id. (quotation omitted). The excess earnings are "capitalized and then constitute the value of goodwill." Id. (quotation omitted).

In reaching the $743,000 figure, Albright determined an initial "Indicated Invested Capital Value" for the practice of $1,525,845 under the current capital structure. He subtracted debt in the form of a bank note (the interest bearing debt) of $597,462 to arrive at a value of $928,383. He then reduced that value by $185,677 for lack of marketability to reach a fair market value of the practice of $742,706, rounded to $743,000.

On the other hand, the petitioner's expert, Richard Maloney, concluded that the fair market value of the practice was $188,000. He found that the

6

"Valuation of Invested Capital" of the practice was $818,610. He then reduced that figure by the long-term bank debt of $597,462 for a "Valuation of Equity" of $221,148. He then further reduced the valuation of equity by $33,172 for lack of marketability for a fair market value of $187,976, rounded to $188,000. The court noted that the petitioner's expert opined that the substantial bank loan and stockholder loan made by the petitioner "significantly reduced the value of his dental practice."

The court reviewed each expert's opinion and arrived at a fair market value of $700,000, which it noted was "fairly consistent with Mr. Albright's appraisal." The court stated that this figure was "not an unreasonable amount considering that on September 19, 2000, over 13 years before the two appraisals were done, [the petitioner] valued on the asset section of the prenuptial document that his Practice was worth $550,000." Cf. Cottrell, 163 N.H. at 749 (in upholding as sustainable the trial court's valuation of a dental practice, noting that the court rejected one expert's 2009 value because it was less than the dental practice's purchase price in 1996). The court also emphasized that the petitioner's monthly gross income as he reported it in 2000 was significantly less than he has earned since 2008 and that he has since paid off the loan on his condominium where the practice had been based, both of which support the $700,000 valuation. Accordingly, subject to any adjustment that may be necessary as a result of the court's clarification and/or reconsideration of the $255,000 shareholder "loan" discussed in section IV of this order, we find that the court's valuation of the dental practice was a sustainable exercise of discretion.

IV

Finally, the petitioner argues that the trial court erred by treating what he characterizes as a $255,000 shareholder "loan" that he made to his dental practice as a marital asset subject to the property distribution. He claims that, because the loan was included in the valuation of the business, it was improperly counted twice. From our review of the trial court's order, we are unable to determine how the court treated these funds. Both of the parties' experts appear to have considered these funds as a capital contribution to the dental practice (rather than as a loan), although it is not clear that either expert's valuation of the practice was affected by this treatment given the capitalized earnings method of valuation used by both experts. The trial court's order does not reflect that it deducted any portion of these funds in arriving at its valuation of the practice, but at times in the order it did refer to the transfer of these funds from the petitioner to the practice as a "loan." The trial court's order focused on the fact that the transfer of these funds to the practice was made shortly after the respondent discovered that the petitioner was having an extramarital affair, and intimated that this may not have been done for legitimate business purposes. However, although lack of a proper business purpose may provide justification for the court disregarding the

7

transfer of these funds to the practice, it would not justify counting these funds both as part of the value of the dental practice <u>and</u> as a separate asset held by the petitioner.

Because the record is unclear as to what role, if any, the $255,000 "loan" played in the court's valuation of the dental practice, and as to whether the court "double counted" these funds both as part of its valuation of the dental practice and as a separate marital asset, we vacate the court's order to the extent it addresses the $255,000 "loan" and remand this issue to the trial court for clarification and/or modification of its ruling consistent with this order.

<u>Affirmed in part; vacated in part; and remanded</u>.

DALIANIS, C.J., and HICKS, CONBOY, LYNN, and BASSETT, JJ., concurred.

**Eileen Fox,
Clerk**