338 So.2d 1111 (1976)
Muriel LUTGERT, Appellant,
v.
Raymond L. LUTGERT, Appellee.
No. 75-1748.
District Court of Appeal of Florida, Second District.
October 27, 1976.
Rehearing Denied November 24, 1976.
*1112 Marion E. Sibley and Robert C. Ward of Sibley, Giblin, Levenson & Ward, Miami Beach, for appellant.
B. Clarke Nichols of Vega, Brown & Nichols, Naples, for appellee.
McNULTY, Chief Judge.
We void this day an antenuptial agreement because of involuntariness on the part of the wife.
The ten-year marriage of the parties hereto was dissolved upon the petition of the husband. An antenuptial agreement which, among other things, provided for the matter of support or alimony and a waiver by the wife of attorneys fees in the event of separation or divorce was sustained by the trial court and the questions relating to alimony and attorneys fees were adjudicated accordingly. The relevant portions of the agreement are as follows:

"FIRST: The said RAYMOND L. LUTGERT represents that his present estate consists of approximately Three Million Dollars ($3,000,000.00) in value. The nature of his assets are such that precise valuation is impossible, but this is believed to be a reasonable and conservative figure at this time.
"* * *

"THIRD: All the personal and real estate now owned by the said RAYMOND L. LUTGERT shall be his own personal estate to be dealt with by him during his lifetime or by will as freely as though this agreement had not been executed in all respects except as indicated immediately hereinafter, namely:
"* * *
"C. The foregoing provisions hereof are in contemplation of the parties remaining married to and living with each other until the death of one of them. However, it is the desire of the parties to recognize the possibility of presently unanticipated separation or divorce.
Each of the parties has been previously married and is aware of the expense and possible publicity with resultant personal embarrassment, which may result from court controversy in a divorce or separate maintenance action over financial matters, in addition to great emotional strain.
The parties therefore further agree as follows:
In the event of the separation of the parties with or without divorce the said RAYMOND L. LUTGERT will pay to the said MURIEL STEVENSON the sum of One Thousand Dollars ($1,000.00) per month so long as she shall live, and not remarry.
Such payments shall be in full of any support money or alimony from the said RAYMOND L. LUTGERT to the said MURIEL STEVENSON, and each party shall pay his or her own attorneys fees and other expenses in any separation or divorce proceeding." (Italics ours.)
*1113 In sustaining the agreement the trial court found in pertinent part as follows:
"1. The parties entered into a valid prenuptial agreement according to the standards set forth in Del Vecchio, 143 So.2d 17. In reaching this conclusion the Court weighed the testimony of all witnesses concerning the circumstances of the signing of the agreement, the fact that the time element from the first discussion of the agreement by the parties and, actually, from her reading of the first draft, would have allowed her to consult any attorney of her own choosing for advice on the agreement but that she did consult with the law firm of Cummings and Wyman .. . and also, the Court considered that both parties were mature and this was not a first venture onto the sea of matrimony for either party.
"As to the `full and frank disclosure to wife, before signing of agreement of husband's worth, or, absent such disclosure, a general and approximate knowledge, by the wife of the prospective husband's property' as set forth in Del Vecchio, supra, the Court has the benefit of statements of the financial condition of husband on July 1, 1963 ($3,163,000) and again on September 30, 1974, ($3,915,929), together with a statement as to the financial condition of the prospective husband as set forth in the agreement itself... . In addition, testimony showed that the parties lived in close proximity to each other, moved in the same social circles, and had ample opportunity to observe the other's standard of living for a considerable period of time prior to their marriage to each other.
"The Court specifically finds that the agreement was signed freely and voluntarily by the parties, that when the wife signed same she had or reasonably should have had a general and approximate knowledge of the character and extent of the husband's property, and, as to the variation in the husband's financial status at the time of the signing of the agreement and the hearing of this cause `the vicissitudes of his fortune in the interval were only that which can be said to have been reasonably contemplated from the nature of his assets', Singer v. Singer, 4th DCA, (1975), 318 So.2d 438. The testimony also shows that the personal financial standing of the wife also changed considerably for the better during the period of the marriage of the parties... ." (Italics ours.)
There is sufficient evidence in the record to support the foregoing findings of the trial court except, in our view, the findings of validity as respects the free and voluntary execution by the wife; and as indicated this is the basis of our determination that the wife can avoid the agreement.
While the testimony relating to the execution of the agreement is conflicting in several particulars, we accept the husband's version except as to the undenied portions of the wife's version. A narrative of significant events follows:
The parties, and their then spouses, were acquainted socially for a considerable period of time before their marriage in Chicago, where they previously resided. Their relationship ripened into a love affair after their respective former spouses became illicitly involved with each other and two divorces ensued. They kept company for approximately a year and became engaged some four weeks prior to their marriage herein at 12:30 in the early morning hours of Friday, April 30, 1965.
An understanding of the odd hour of the marriage can be had from the events which began on Monday evening of that fateful week, April 26, when appellee husband called and suggested that they be married shortly after midnight on Thursday, April 29, provided they could book passage for an extended honeymoon cruise on the SS Constitution, scheduled to sail from New York later on that same day. The wife ecstatically agreed.
On Tuesday morning, April 27, the husband advised appellant by telephone that he had succeeded in getting passage on the Constitution and that the wedding plans could go ahead. The parties met shortly *1114 thereafter and spent the rest of that day purchasing a sable stole for her and a wedding outfit for him; getting their passports straightened out; getting blood tests; arranging for a state Court of Appeals judge to marry them; acquiring the use of V.I.P facilities, called the "Topflight Room" of Northwest Airlines, at the O'Hare Airport in Chicago; and inviting family and friends to the wedding.
On Wednesday, April 28, the wife purchased her trousseau, after which the parties met at their jewelers to select and fit wedding rings. Thereafter, a marriage license was procured.
The following day, Thursday, April 29, is the critical date concerning the execution of the antenuptial agreement. That afternoon the parties met again at the jewelers to finalize the sizing of the wedding rings. While they were being readied the husband took the antenuptial agreement out of his pocket and for the first time presented it to appellant and asked her to sign it. She objected, saying that it indicated lack of trust on his part and that she didn't want the marriage to start out on such a weak footing. He made light of that suggestion, proclaiming that the agreement was of no consequence anyway since they wouldn't we getting a divorce. He joked about being married for some 80 years, getting married at their age. The wife still objected; so the husband called his Chicago lawyers, Cummings and Wyman, while still at the jewelers and apparently some conversation ensued between the lawyers and the wife after the husband put her on the telephone. While the evidence is conflicting as to whether this phone conversation resulted in any change in the wording of the agreement (the husband contends it did), the documentary evidence itself irrefutably demonstrates that the document was in fact drawn up and finally drafted the preceding Monday, April 26, and was not changed in any respect thereafter.
As a further insight into the events leading up to the agreement herein, it is agreed that the subject of an antenuptial agreement had been brought up on more than one occasion for perhaps up to a year before the marriage herein. The husband testified that he wanted such an agreement because his father had advised it and because he had had extreme difficulty during his first divorce. No specific agreement nor draft thereof was made, however, until the instant agreement was prepared on April 26 of that eventful week in 1965 as aforesaid. The wife insists that she consistently objected to such an agreement, whatever its terms, and the sole testimony in rebuttal of this is the husband's statement that "there was no refutation of any willingness to sign such an agreement."
In any case, following the aforementioned phone call, the wife finally agreed reluctantly to sign the agreement after the husband insisted that the wedding would otherwise be called off. She contends that she signed the agreement then and there at the jewelers; but we can accept the husband's version that it wasn't signed until just before the wedding that night (i.e., about 12:30 a.m. on Friday) when the minute hand of the clock was on the rise "for luck," as several of the witnesses testified. Two witnesses corroborated the husband's version that the agreement was indeed signed at the airport shortly before the wedding, one Williams, the husband's nephew, who also was a notary public and who appears to have taken the acknowledgment of the parties, and one of the husband's attorneys who was a member of the aforementioned Cummings and Wyman firm. Each additionally testified that he did not hear the wife voice any objections to the agreement as she executed it.
After the marriage, as may be gleaned from the admitted wealth of the husband the parties enjoyed a lifestyle reserved only to the fabulously rich. While the trial court found that during the times material herein the husband was worth from approximately $3,100,000 at the beginning to $3,900,000 at the present time, the wife points to much of the record tending to the conclusion that he is really presently worth nearer to $25,000,000. Indeed the admitted opulent lifestyle would appear to be supportable *1115 only if the latter figure were found to be the fact. For example, the present homeplace in Naples, Florida, is a palatial mansion directly on the Gulf of Mexico. It has eight bedrooms, twelve baths, a five-car garage, a guest house and servants' quarters and is surrounded by some four and a half acres of formal gardens with a gate house at its entrance. The parties owned at least three luxury motor yachts, one of them a 50-footer custom built in North Carolina, and one a 63-footer custom built in Japan. They at one time owned a private turbojet airplane. They drove only luxury cars, including Rolls Royces and Lincoln Continentals. They took at least one round-the-world cruise and several extended cruises to Europe and other parts of the world. They had staffs of servants and gardeners. He gave expensive gifts of valuable jewelry. The husband has a hobby of collecting classic automobiles, his present collection having a value in excess of $900,000; and on one occasion he bid for and purchased an original Duesenberg automobile for some $207,000.
The wife was fully aware before the marriage, of course, that the husband was a man of great wealth  and lived it. But all this, it seems to us, should only point up the expectancy of security on the part of the wife at the time of her acceptance of the marriage proposal, as well as the disproportionate relative positions of the parties, when it is emphasized that she had only a relatively small amount of cash in her own right at that time, together with some interest in the marital home of her prior marriage, and approximately $600 a month alimony (for only 10 years) as a result of a prior divorce. Clearly, since the agreement herein limits her simply to $1,000 a month alimony in the event of separation or divorce, and no attorneys fees, a grossly disproportionate benefit to the husband as a result of the agreement is startlingly patent.
Now, it is black letter law that the parties to an antenuptial agreement do not deal at arms length with each other. Their relationship is one of mutual trust and confidence.[1] While such agreements are not per se suspect in the law, the courts nevertheless scrutinize them with care; and the parties must exercise the highest degree of good faith, candor and sincerity in all matters bearing on the terms and execution of the proposed agreement, with fairness being the ultimate measure.[2] Moreover, a presumption of undue influence or overreaching arises in transactions or contracts between persons in such a confidential relationship when it is clear that the dominant party thereto is the grossly disproportionate beneficiary of the transaction.[3] It is well settled, for example, that with respect to the issue of full disclosure of the prospective husband's wealth, a disproportionate benefit to the husband in an antenuptial agreement casts upon him the burden of showing that the wife in fact did have full or sufficient knowledge of the husband's wealth.[4]
The presumption which arises in these cases operates against the party receiving such benefit and imposes upon him the burden of coming forth with evidence sufficient to rebut it to the extent necessary to avoid its preponderating on the issue to which it relates.[5] We see no reason why the burden on the part of the husband ought be any less with respect to the issue *1116 of voluntariness on the part of the wife in entering into such an agreement, than it is with respect to the issue of full disclosure, when there is a grossly disproportionate benefit to him together with sufficient coercive circumstances surrounding the execution of the agreement as to give rise to a presumption of undue influence or overreaching.
Here, it appears that the wife was in her middle or late thirties at the time of the agreement. The instant marriage was her third, following one of approximately seventeen years during which she bore three children. Her first marriage was of very short duration having been entered into when she was seventeen years old. Concededly, therefore, it can hardly be said that she was mesmerized by prehymeneal ardor when she entered into the agreement. But that doesn't mean that her volition could not still have been overcome by circumstances sufficiently coercive in nature.
There is ample conclusive evidence of such circumstances in this case. To begin with, the husband sprang the agreement upon her and demanded its execution within twenty four hours of the wedding; and it has been said that a woman ought not be "too much hurried" into such an agreement.[6] Passage had been booked for a honeymoon cruise to Europe; rings had been bought; a trousseau had been bought; all invitations to family and friends had been given; all arrangements otherwise had been made; an ultimatum had been delivered by the husband: "No agreement, no wedding"; and, obviously, there arose a sudden stark awareness of the potential immediate loss of a future life of enormous grandeur.
Surely, particularly at the last moment, a prospective wife ought not be forced into a position of being "bought" at the price of losing all if she does not agree to a grossly disproportionate benefit to the husband should she leave him under any and all circumstances, any more than she should be permitted to "sell" herself at zero hour for an agreement resulting in a grossly disproportionate gain to her upon the same eventuality. Along with public policy considerations this is the very reason why "fairness" is the polestar in these agreements; and fairness would certainly include an opportunity to seek independent advice and a reasonable time to reflect on the proposed terms.
Clearly, in our view, all the circumstances surrounding the execution of the agreement in this case, including its disproportionate terms, militate against fairness and are sufficient to support a presumption, as a matter of law, of undue influence and overreaching which bore adversely on the free exercise of the wife's will. We certainly couldn't indulge a contrary presumption; the wife could hardly say more in rebuttal. Nor need we go so far as to say that the wife proved in voluntariness as a matter of law. The device of a presumption such as that we employ here is the prevalent judicial tool commonly used in the determination vel non of undue influence or overreaching in transactions arising out of confidential relationships.[7]
The burden thus shifted to the husband to rebut this presumption by coming forth with some competent evidence to the contrary.[8] We have searched the record in vain to find it  it simply isn't there. The mere statement by the husband that "there was no refutation of any willingness [on the part of the wife] to sign such an agreement," which alluded to prior discussions of an antenuptial agreement generally and not to the specific one involved here which was objected to, will not alone suffice.
The question here is not whether the wife knew what she was signing or what she was or was not getting. The agreement is clear on its face and she can't be heard to deny its contents. The question is whether she, in the free exercise of her will, voluntarily signed it. Evidence that she may have *1117 gotten some legal advice has no great impact on this issue either. For one thing, the only evidence of legal advice is that within twenty four hours before the wedding, when the husband first presented the antenuptial agreement and she rebelled, she spoke on the telephone to his lawyers; and we have already indicated that the documentary evidence conclusively demonstrates that this conversation could not and did not result in any change in the agreement enuring to the benefit of the wife. Additionally, in the face of the grossly disproportionate benefit to the husband, whatever legal advice she may have gotten at that time certainly wouldn't tend to neutralize the other coercive factors bearing on her volition. In short, the presumption of undue influence and overreaching which we perceive to have been established as a matter of law is not rebutted at all and thus, remaining in the case, it must prevail as though the conclusion to which it points is admitted.[9] The wife is entitled to avoid the agreement.
In view of our disposition hereof, it is unnecessary at this time to consider the other points raised on appeal. It is also unnecessary to consider the improved financial condition of the wife. This factor will undoubtedly bear on the equities existing between the parties as may be appropriate in the determination of alimony and/or the settlement of property rights generally.
The husband's single cross-assignment of error is without merit. The judgment as to this is therefore affirmed.
But the judgment in other respects inconsistent with this opinion should be, and it is hereby, reversed; and the cause is remanded for further proceedings consonant herewith.
HOBSON and GRIMES, JJ., concur.
NOTES
[1] See, e.g., Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla. 1962); Weeks v. Weeks, 143 Fla. 686, 197 So. 393 (1940).
[2] See, e.g., Reese v. Reese, 212 So.2d 33 (Fla. 3d DCA 1968). See also 41 Am.Jur.2d, Husband and Wife, § 296 at p. 243; 17 Fla.Jur. Husband and Wife, & 47 at p. 109; and A. Lindey, Separation Agreements and Ante-Nuptial Contracts, Vol. 2, § 90-37 et seq. (rev. ed. 1967).
[3] See, e.g., 25 Am.Jur.2d, Duress and Undue Influence, § 44, at p. 404 and 41 Am.Jur.2d, Husband and Wife, § 314, at p. 225.
[4] See Posner v. Posner, 257 So.2d 530, 534 (Fla. 1972), and Del Vecchio v. Del Vecchio, note 1 supra.
[5] Cf. In re Estate of Carpenter, 253 So.2d 697 (Fla. 1971). Also cf. Majorana v. Constantine, 318 So.2d 185 (Fla.2d DCA 1975).
[6] See In re Estate of Maag, 119 Neb. 237, 228 N.W. 537, 541 (1930).
[7] See n. 3, supra.
[8] See n. 5, supra.
[9] See n. 5, supra. Also cf. Leonetti v. Boone, 74 So.2d 551 (Fla. 1954).