656 So.2d 168 (1995)
Gayle HJORTAAS, Appellant,
v.
Philip Joseph McCABE, Appellee.
No. 94-00034.
District Court of Appeal of Florida, Second District.
April 7, 1995.
Rehearing Denied May 17, 1995.
*169 Cynthia L. Greene, Law Offices of Elser, Greene, Hodor & Fabar, Miami, and Law Offices of Long, Tuminello, Besso & Quinlan, Naples, for appellant.
Robert A. Harper, Jr., Robert Augustus Harper Law Firm, P.A., Tallahassee, for appellee.
FRANK, Chief Judge.
Gayle Hjortaas, the former wife of Philip Joseph McCabe, has appealed from the final judgment of dissolution of marriage in which the trial judge found the parties' prenuptial agreement binding and valid. Because Philip's disclosure of his assets was insufficient as a matter of law, we reverse the final judgment and remand for the trial court again to consider an equitable distribution.
When Gayle Hjortaas met Philip McCabe in 1984, she was a real estate office secretary who occasionally handled rentals. Philip was the owner of a "bed and breakfast" in Maine but he leased a villa in Naples, Florida, through Gayle's real estate firm. They dated briefly in November of 1984, and ultimately they spent a short New Year's holiday together in Canada. In the spring of 1985 Gayle stayed at the Maine inn. Philip spent the following winter season in Florida, during which he purchased some land in Naples with the idea of constructing a hotel.
Gayle and Philip became engaged in the spring of 1986. The couple lived together in an apartment while Philip pursued his hotel construction plans. In March of 1987, he opened the Inn of Naples. In November of 1986 Gayle left her real estate job and began to work for Philip at the construction site.
In early April of 1987 Philip proposed that he and Gayle marry on his fortieth birthday  May 1. He also told Gayle that he wanted her to execute a prenuptial agreement. She was opposed to the idea because she did not contemplate divorce. Philip, however, met with his attorney and provided him with the terms of a prenuptial agreement he desired. This conversation occurred in early April, and although Gayle knew the purpose of the meeting, she was not a party to any discussions involving either the terms of an agreement or Philip's net worth. The agreement was actually drafted on April 28, 1987, and was executed in identical form two days later, the day before the scheduled wedding. At that time no financial disclosure documents were appended as exhibits, and in fact Philip did not create such a form until a month later. His statement reflected a net worth of almost two million dollars. Gayle's net worth was zero.
Six years later, when the marriage had disintegrated, Philip sought enforcement of the prenuptial agreement, which according to a schedule provided Gayle with a lump sum payment of $48,000. The agreement had been structured so that Gayle would receive a payment of between zero and $98,000, the *170 specific amount being determined pursuant to a sliding scale depending upon the length of the marriage. Gayle attempted to have the agreement set aside, alleging that it was unfair, unreasonable, inequitable and the product of Philip's coercion, undue influence, and duress.
We agree with Gayle. The contract should have been nullified by the trial court and we expressly find that the trial court incorrectly applied the test set out in Casto v. Casto, 508 So.2d 330, 333 (Fla. 1987):
First, a spouse may set aside or modify an agreement by establishing that it was reached under fraud, deceit, duress, coercion, misrepresentation, or overreaching.
The second ground to vacate a settlement agreement contains multiple elements. Initially, the challenging spouse must establish that the agreement makes an unfair or unreasonable provision for that spouse, given the circumstances of the parties... .
Once the claiming spouse establishes that the agreement is unreasonable, a presumption arises that there was either concealment by the defending spouse or a presumed lack of knowledge by the challenging spouse of the defending spouse's finances at the time the agreement was reached. The burden then shifts to the defending spouse, who may rebut these presumptions by showing that there was either (a) a full, frank disclosure to the challenging spouse by the defending spouse before the signing of the agreement relative to the value of all the marital property and the income of the parties, or (b) a general and approximate knowledge by the challenging spouse of the character and extent of the marital property sufficient to obtain a value by reasonable means, as well as a general knowledge of the income of the parties (citations omitted).
First, the timing of the signing of the document indicates that Gayle's signature was the product of duress. Two days before the wedding Gayle was presented with a document, the actual terms of which were previously unknown to her and which contained no information about Philip's finances. She had only one day to seek counsel from her own attorney, to make an independent evaluation of the contract, or to cancel her wedding. The only rational conclusion is that her signature was the product of unwarranted compulsion, and the document should have been set aside on that basis. Lutgert v. Lutgert, 338 So.2d 1111 (Fla. 2d DCA 1976).
Even assuming that Gayle did acquire some knowledge about the proposed terms of the agreement when they met with Philip's attorney some three weeks prior to the wedding, thus diminishing the probability that she was coerced, the agreement cannot withstand that second test of Casto. First, the provision for Gayle is inequitable. She is to leave the marriage with a lump sum of $48,000 and nothing else. The marital home was titled solely in Philip's name, and Gayle was employed by Philip. A comparison of the net worth of Philip and Gayle at the time of the execution of the contract  approximately two million dollars to zero  is merely reflective of the financial power that Philip was able to exert over Gayle. The provision for Gayle is truly disproportionate to Philip's means. Casto, 508 So.2d at 333 (citing Del Vecchio v. Del Vecchio, 143 So.2d 17, 20 (Fla. 1962)).
Given the equitable inadequacies of the agreement, Philip's position can only be sustained if he can show sufficient disclosure of his financial assets. Rather than making "a full, frank disclosure" prior to the signing of the document, Philip relied upon the second Casto subtest and attempted to show that Gayle possessed "a general and approximate knowledge ... of the character and extent of the marital property ... as well as a general knowledge of the income of the parties." To bolster its finding that Gayle possessed such knowledge the trial court attached substantial significance to some essentially irrelevant facts: i.e., that the parties resided together before the marriage, that Gayle had a real estate license, that Gayle had been previously married and divorced and had seen a lawyer in her first divorce, that Gayle had visited the Maine property on several occasions, that Gayle knew of the construction of the Inn of Naples, and that Gayle worked at the Inn. Gayle's observations of Philip's Maine and Naples properties could possibly *171 have led her to a marginal understanding of the extent of Philip's wealth, but there is nothing to suggest that Gayle possessed the financial sophistication to convert what she saw into an appraised value. For these reasons, the antenuptial agreement should not have survived Gayle's challenge.
Accordingly, we affirm the final judgment to the extent it dissolves the parties' marriage, but we reverse the incorporation of the prenuptial agreement into the final judgment and remand this matter to the trial court for further proceedings consistent with this opinion.
THREADGILL and PATTERSON, JJ., concur.