# Third District Court of Appeal

## State of Florida

Opinion filed February 3, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-1884
Lower Tribunal No. 17-258-P
_____

**Paul Evan Bates,**
Appellant,

vs.

**Magda Jhovanna Bates,**
Appellee.

An Appeal from a non-final order from the Circuit Court for Monroe County, Sharon I. Hamilton, Judge.

Ross & Girten, and Lauri Waldman Ross, for appellant.

Law Office of Jack Bridges, P.A., and James R. (Jack) Bridges, for appellee.

Before LOGUE, SCALES and LINDSEY, JJ.

SCALES, J.

In this marital dissolution action, Paul Evan Bates appeals an August 30, 2019 non-final order finding the parties' prenuptial agreement invalid because it was the product of duress and coercion. We have jurisdiction. See Fla. R. App. P. 9.130(a)(3)(C)(iii)c. ("Appeals to the district courts of appeal of nonfinal orders are limited to those that . . . determine . . . in family law matters . . . that a marital agreement is invalid in its entirety[.]"). Concluding that the trial court's findings as to coercion are supported by competent, substantial evidence, we affirm.[1]

## I. RELEVANT FACTS AND PROCEDURAL BACKGROUND[2]

On May 29, 2001, Paul Evan Bates ("Husband") and Magda Jhovanna Bates ("Wife") met in Cali, Colombia through a matchmaking website called Latin Connection. At the time, Husband was a divorced, forty-one-year-old commercial airline pilot with a net worth of approximately $4 million. Husband was looking for a "Christian based woman of child-bearing age" to marry, bring to the Florida Keys and start a family. Wife, who was a virgin

---

[1] In this opinion, we address only whether the trial court erred by invalidating the parties' prenuptial agreement on the grounds of duress and coercion. We affirm, without discussion, the remainder of the issues raised in this appeal.

[2] The facts set forth herein are taken from the lower court's factual findings in the August 30, 2019 non-final order and, to the extent they are undisputed, from the trial transcript.

and had never been married, turned eighteen years old just three days prior to meeting Husband. She had the equivalent of a high school education and was in her second year of medical school in Colombia. Wife was looking for a wealthy American man to marry and to bring her to the United States.

The parties' courtship was far from ordinary. Because Husband did not speak Spanish and Wife spoke little English, Husband used a translator during the parties' initial meetings. A chaperone accompanied the parties on their dates, which occurred when Husband had layovers on flights to Cali. To breach the language barrier, Husband used a handheld translator and translation programs on a laptop.

In June 2001, during an unchaperoned trip to Cartagena, Colombia, the parties had sex and became engaged the same day. When Wife later learned that she was pregnant, Husband paid for her to have an abortion in mid-August 2001, shortly before the parties married on August 31, 2001. Wife's family was unaware of her premarital sex, pregnancy and abortion.

A.    The prenuptial agreement and the parties' marriage

During their whirlwind courtship, Husband told Wife that he wanted her to sign a prenuptial agreement. Husband obtained a form prenuptial agreement from a co-pilot acquaintance and modified the agreement to

Husband's satisfaction. The parties never discussed the prenuptial agreement or negotiated any of its terms.

In late August 2001, Wife took the prenuptial agreement to a Colombian attorney, Alba Mielan Ceballos De Lince ("Attorney Ceballos"), to have the agreement translated from English into Spanish. On August 29, 2001, Attorney Ceballos provided Wife with the Spanish translation of the prenuptial agreement. Despite Attorney Ceballos signing a certification in the agreement attesting that she was knowledgeable in Florida law and had advised Wife about her rights under the subject agreement, Attorney Ceballos now admits that she does not know Florida law and that she did nothing more than have the agreement translated into Spanish by a third party.

The next day, August 30, 2001, the parties executed the English and Spanish versions of the prenuptial agreement before a notary public. Wife did not read the agreement before signing it. On August 31, 2001, the parties were married in a civil ceremony at Wife's home that was attended by a small group of family and friends, followed by a catered meal and live entertainment.

Several days following the civil ceremony, the parties went to a previously scheduled appointment at the Colombian embassy to start Wife's emigration process.

In December 2001, the parties had a religious ceremony performed in a Catholic church in Colombia. The reason for the delay between the civil and religious ceremonies was two-fold. First, as a divorced, non-denominational Christian, Husband, in order to be married in the Catholic church, needed to perform various steps to obtain approval from the Colombian archdiocese. This process took months to accomplish. Second, not wanting to delay the emigration process, the parties had the civil ceremony first, at Wife's request.

Thereafter, with the emigration process completed and the religious ceremony performed, Wife moved to the Florida Keys to live with Husband, where Husband resided and owned businesses. The parties had five children during the course of their marriage.

B.    The verified petition for dissolution of marriage

In May 2017, Wife filed a verified petition for dissolution of marriage with minor children in the Monroe County Circuit Court. Therein, Wife sought to set aside the prenuptial agreement "on the grounds that it was reached under fraud, deceit, duress, coercion, misrepresentation or

overreaching." Among other things, the pleading alleged that the prenuptial agreement had been "executed involuntarily as a result of the timing of the Agreement." As a separate basis for invalidating the prenuptial agreement, the verified petition asserted that "[t]he provisions for the Wife in the Agreement are grossly inequitable."

C. The trial on the validity of the prenuptial agreement

The trial court held a bench trial on the validity of the prenuptial agreement on March 12, 15, 19 and June 10, 2019. The court heard live testimony from three witnesses: Wife, Husband, and a former employee of one of Husband's businesses. The parties also introduced the deposition testimony of Wife, Husband and Attorney Ceballos.[3]

Consistent with her deposition testimony, Wife testified that she was a virgin prior to her June 2001 trip to Cartagena with Husband; that she became pregnant from having sex with Husband; that Husband paid for her to have an abortion in mid-August 2001; and that she was raised in a strict Catholic household that did not approve of premarital sex or abortion. Further, Wife was in severe pain and distress related to the abortion both on August 29, 2001, when she retrieved the Spanish translation of the

---

[3] Because the trial court based its findings of duress and coercion on the court's acceptance of Wife's testimony and rejection of Husband's testimony, this opinion focuses on Wife's testimony.

6

prenuptial agreement from Attorney Ceballos, and on August 30, 2001, when she executed the prenuptial agreement before a notary. According to Wife, "[t]he only reason it didn't get signed on the 29th is because I could barely walk. I was bleeding. I was bleeding . . . [a]nd in pain."

Wife further testified that when Husband first presented her with the English version of the prenuptial agreement in late August 2001, Husband told her repeatedly that signing the prenuptial agreement "was a requirement" for Wife to immigrate to the United States. In particular, Wife testified that, "he told me before I had the appointment [with the Colombian embassy] and in order for [me] to come to the States you have to sign this."

On cross-examination, Wife agreed that she would have signed anything that Husband had given her to sign because Wife loved and wanted to marry Husband, and because Wife wanted to immigrate to the United States.

D.    The non-final order invalidating the prenuptial agreement

On August 30, 2019, the trial court entered a non-final order invalidating the parties' prenuptial agreement because it "was the product of duress and coercion." As to "coercion" the trial court held:

> 15. Mrs. Bates was in a vulnerable emotional position at the time of executing the prenuptial agreement. She had endured an abortion only a couple of weeks before the legal wedding was scheduled. Mrs. Bates had already scheduled an appointment

7

with immigration set for a date shortly after the legal wedding. The demand to sign the translated prenuptial agreement the day before the wedding or the consequences would be no wedding and no immigration, is clear *coercion*.

(Emphasis added). As to "duress" the trial court held:

19. The fact that Mrs. Bates would have signed anything to marry Mr. Bates appears to benefit Mr. Bates' argument that the agreement was executed freely and voluntarily. However, it can conversely be used to show the disparity of the parties' bargaining positions. Mrs. Bates came from a strict Catholic family. Mr. Bates testified that she had to be home at a certain hour or her mother would throw all her clothes out into the alley. Mrs. Bates was desperate to marry Mr. Bates and come to the United States. She had given her virginity to Mr. Bates, got pregnant, [and] had an abortion, all while supposedly expertly negotiating the terms of the prenuptial agreement.[4] These circumstances coupled with the fact that Mrs. Bates came from a strict Catholic family that would not condone having sex prior to the wedding day (not to mention what her family would have done had they known of the abortion), added more emotional stress and *duress* to Mrs. Bates during that time.

(Emphasis added). Husband timely appealed this August 30, 2019 non-final order.

## II.    STANDARD OF REVIEW

We review the trial court's invalidation of the subject prenuptial agreement for competent, substantial evidence. See Ziegler v. Natera, 279

---

[4] The trial court discounted Husband's testimony that the parties had discussed and negotiated the agreement, concluding that "no meaningful negotiations could have occurred with the complex legal language contained in the document with the language barriers."

So. 3d 1240, 1242 (Fla. 3d DCA 2019). "[T]he findings of the trial court come to this court clothed with a presumption of correctness[,] and will not be disturbed absent a showing that there was no competent evidence to sustain them." Id. (quoting Baker v. Baker, 394 So. 2d 465, 466 (Fla. 4th DCA 1981)). Accordingly, "[w]e take the facts most favorably in support of the trial court's decision." Waton v. Waton, 887 So. 2d 419, 422 (Fla. 4th DCA 2004).

### III. ANALYSIS

There are two distinct grounds for invalidating a prenuptial agreement: (1) where the defending spouse has engaged in "fraud, deceit, duress, coercion, misrepresentation, or overreaching"; and (2) where "the agreement makes an unfair or unreasonable provision for [the challenging] spouse, given the [relative] circumstances of the parties." Casto v. Casto, 508 So. 2d 330, 333 (Fla. 1987).[5] In this case, Wife's verified petition argued that the prenuptial agreement was invalid on both grounds, arguing that the agreement was the product of duress and coercion (ground 1) and that the agreement contained provisions that were grossly inequitable (ground 2).

---

[5] Although Casto involved a postnuptial agreement, the legal analysis employed therein applies to prenuptial agreements as well. See Waton, 887 So. 2d at 423 n.1. Effective October 1, 2007, the grounds for invalidating a prenuptial agreement outlined by the Florida Supreme Court in Casto were codified in section 61.079(7) of the Florida Statutes. See Ch. 2007-171, § 1, Laws of Fla.

Because the trial court's August 30, 2019 non-final order concluded only that the prenuptial agreement was the product of duress and coercion, we limit our analysis to the trial court's conclusion.

A. Definition and elements of "duress"

In the context of considering whether a prenuptial agreement is invalid, this Court has defined "duress" as being a "condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him [or her] to do an act or make a contract not of his [or her] own volition." Ziegler, 279 So. 3d at 1242 (quoting Herald v. Hardin, 116 So. 863, 864 (Fla. 1928)).[6] To prove duress, the challenging spouse must show: (1) "that the act sought to be set aside was effected involuntarily and thus not as an exercise of free will"; and (2) "that this condition of mind was caused by some improper and coercive conduct of the opposite side." Id. (quoting City of Miami v. Kory, 394 So. 2d 494, 497 (Fla.

---

[6] Husband would have this Court apply a more strenuous definition for "duress" and require that the defending spouse's conduct not only be "improper," but also be "unlawful." See Fuller v. Roberts, 35 Fla. 110 (Fla. 1895) (defining duress in the context of a claim for duress of goods, determining the compelling party's actions must be "unlawful or wrongful"). We disagree. There is a clear distinction between an action for duress of goods – discussed in Fuller – and a petition to invalidate a prenuptial agreement based on the actions of the defending spouse. Certainly, unlawful conduct is improper; nevertheless, Husband cites no family law case that has defined "duress" as requiring the defending spouse's conduct be unlawful.

3d DCA 1981)). In other words, the defending spouse's external pressure must result in the challenging spouse's subjective loss of free will at the time the prenuptial agreement is signed. Id.; Parra de Rey v. Rey, 114 So. 3d 371, 387 (Fla. 3d DCA 2013) ("[T]he party claiming duress must establish that the effects of the alleged coercive behavior affected their *subjective intent to act.*").

    B. Definition and elements of "coercion"

Neither party provided any case that defines "coercion" in the context of determining the validity of a prenuptial agreement. Nor did this Court's review of Florida case law reveal any such definition for coercion. While similar, the terms "duress" and "coercion" are certainly not synonymous in all respects. Otherwise, the use of both words by the Florida Supreme Court and the Florida Legislature would be redundant. Nevertheless, at times, it appears the Florida appellate courts have applied the terms interchangeably. See e.g., Paris v. Paris, 412 So. 2d 952, 953 (Fla. 1st DCA 1982) (defining "duress" and finding that the defending spouse's "acts amounted to duress and coercion"); Flaherty v. Flaherty, 128 So. 3d 920, 923 (Fla. 2d DCA 2013) (determining that the parties' prenuptial agreement "should have been set aside based upon duress and coercion," because the "coercive circumstances" demonstrated that the challenging spouse's execution of the

11

agreement was not voluntary); <u>Berger v. Berger</u>, 466 So. 2d 1149, 1151 (Fla. 4th DCA 1985) (concluding the defending spouse's acts that amounted to criminal extortion "must inevitably involve coercion and duress").

In <u>Gribbin v. Gribbin</u>, 499 So. 2d 858, 862 (Fla. 4th DCA 1986) (Glickstein, J., concurring specially), the concurring judge quoted an Ohio Supreme Court decision that observed the primary difference between "duress" and "coercion" is the level of compulsion exerted by the compelling party. That is, while "duress" generally occurs by means of actual physical force or threatened physical force to one's person or by threats to one's property or reputation, "coercion" is "generally defined more broadly to include undue influence and other lesser forms of compulsion." <u>Id.</u> (quoting <u>State v. Woods</u>, 357 N.E. 2d 1059, 1065 (1976)). In either instance (duress or coercion), the act of compulsion must be sufficient to overcome the recipient's free will such that the recipient's actions are not of his or her own volition.

Black's Law Dictionary similarly defines "coercion" as the "[c]ompulsion of a free agent by physical, moral or economic force or threat of physical force." <u>Coercion</u>, BLACK'S LAW DICTIONARY (11th ed. 2019). The definition further compares "moral coercion" with "undue influence," which is defined as "[t]he improper use of power or trust in a way that deprives a person of

12

free will and substitutes another's objective; the exercise of enough control over another person that a questioned act by this person would not have otherwise been performed, the person's free agency having been overmastered." Undue Influence, BLACK'S LAW DICTIONARY (11th ed. 2019).[7]

Appellate courts outside of Florida have likewise recognized that "duress" and "coercion" are distinct terms in the context of invalidating a prenuptial agreement and resorted to Black's Law Dictionary to define their meaning. See Balogh v. Balogh, 332 P.3d 631, 647 (Haw. 2014); Fordeley v. Fordeley, 2020-Ohio-5380, 2020 WL 6867942, at *3 (Ohio Ct. App. Nov. 23, 2020); Baumgartner v. Baumgartner, L-88-032, 1989 WL 80947, at *10 (Ohio Ct. App. July 21, 1989); see also Gross v. Gross, 464 N.E.2d 500, 506 (Ohio 1984) (stating that the terms fraud, duress, coercion, and overreaching "may be read with their generally accepted meaning being applicable"); cf. In re Marriage of Bonds, 5 P.3d 815, 823 (Cal. 2000) (relying on Black's Law Dictionary for the definition of "voluntarily" because California's Uniform Premarital Agreement Act – like Florida's Act – fails to define the term); In re

---

[7] Not surprisingly, Florida's appellate courts have used the term "undue influence" when considering whether the challenging spouse executed a prenuptial agreement voluntarily. See Lutgert v. Lutgert, 338 So. 2d 1111, 1116 (Fla. 2d DCA 1976) (determining that "sufficient coercive circumstances" surrounding the execution of a prenuptial agreement "g[a]ve rise to a presumption of undue influence and overreaching"); Flaherty, 128 So. 3d at 923 (same).

Estate of Psota, 900 N.W.2d 790, 795 (Neb. 2017) (same); In re Marriage of Shanks, 758 N.W.2d 506, 512 (Iowa 2008) (same).

We find the distinction between "duress" and "coercion" discussed by Judge Glickstein in his special concurrence in Gribbin to be persuasive in the context of considering whether to invalidate a prenuptial agreement. "Coercion" occurs where the defending spouse, through undue influence or moral or economic force, compels the challenging spouse to sign a prenuptial agreement under circumstances which, from a subjective viewpoint, evidence that the challenging spouse did not act of his or her own free will.

C. The trial court's determinations on duress and coercion

In this case, the trial court cited the definitions for duress and coercion discussed by the special concurrence in Gribbin, and then made separate findings of duress and coercion. We will address each determination in turn.

*1. Duress*

The trial court concluded that Wife's premarital sex with Husband, her pregnancy and her subsequent abortion, coupled with Wife coming from a strict Catholic family that would not condone her actions and, perhaps, would exact some form of reprisal upon learning of the abortion, constituted duress. We disagree with the trial court's conclusions in this regard.

14

Duress can occur where the defending spouse threatens an action – even an action that the defending spouse has a right to take – for the defending spouse's own pecuniary advantage.  See Berger, 466 So. 2d at 1151; Paris, 412 So. 2d at 953.

In Berger, the Fourth District invalidated a property settlement agreement executed during a divorce proceeding where the wife presented unrebutted testimony that the husband had "admittedly insisted that [the wife] sign it or he would turn her over to the Internal Revenue Service" for "failing to report substantial cash receipts from the operation of her beauty salon business."  Berger, 466 So. 2d at 1151.  Even though the husband had a right to report the wife to the IRS, our sister court found the husband's action constituted duress because he made the threat for his own pecuniary gain. Id.

In Paris, the First District similarly invalidated a settlement agreement executed during a divorce proceeding where the wife presented unrebutted testimony that "her husband had threatened her that if she did not sign the agreement, he would tell the couple's two minor children that one of their female cousins was, in fact, the wife's daughter from a previous marriage." Paris, 412 So. 3d at 953.  Even though the husband had the right to tell his children that their "cousin" was actually their half-sister, the Paris court

15

concluded that the husband's threat to the wife's reputation amounted to duress because he had threatened to divulge the wife's secret for his own pecuniary advantage. Id.

*Sub judice*, the trial court might have been correct that Wife was fearful as to what would happen if her family, who raised her in a strict Catholic household, learned of Wife's pre-marital relations with Husband, her pregnancy and her subsequent abortion. What is missing in this case, however, is any evidence from which it could be inferred that Husband had threatened to tell Wife's family about these circumstances if Wife did not execute the prenuptial agreement. There being no evidence that Husband threatened to besmirch Wife's reputation for his own pecuniary gain, we conclude that there was not competent, substantial evidence to support the trial court's finding of duress. See Berger, 466 So. 2d at 1151; Paris, 412 So. 2d at 953.

*2. Coercion*

But our inquiry does not end because the trial court separately concluded that Wife was *coerced* by Husband into signing the prenuptial agreement. The trial court essentially concluded that Husband exploited the

16

time pressure aspects[8] of the parties' courtship and Wife's "vulnerable emotional position" to coerce Wife into signing the prenuptial agreement, to Husband's pecuniary advantage.[9]  Specifically, Wife was still experiencing emotional and physical pain from having an abortion just two weeks prior and the parties had an upcoming appointment at the Colombian embassy to start the emigration process that Husband insisted could not take place unless Wife signed the agreement.  Based on these factors, the trial court determined that Husband had engaged in coercion.

---

[8] In the August 30, 2019 non-final order, the trial court highlighted numerous "red flags" that influenced the court's determination, including: "Mrs. Bates [sic] receipt of the prenuptial agreement translated into Spanish on August 29th; the prenuptial agreement being signed by the parties on August 30th with the wedding on August 31st; . . . and the timing of the demand to execute the agreement or there would be no immigration processing and no wedding."

[9] In the August 30, 2019 non-final order, the trial court found that Husband's demand that Wife "sign the translated prenuptial agreement the day before the wedding or the consequence would be no wedding and no immigration, [was] clear coercion."  Given our determination*, supra*, that the primary difference between "duress" and "coercion" is the degree of compulsion exerted by the defending spouse, we conclude that coercion, like duress, can arise where the defending spouse threatens an action for the defending spouse's own pecuniary gain.  See Berger, 466 So. 2d at 1151; Paris, 412 So. 2d at 953.  We, therefore, examine the lower court's finding of coercion within this context.  To this end, we conclude further that the legal principles espoused in the "duress" cases cited in this section are, to the extent discussed herein, equally applicable to "coercion."

17

In this appeal, Husband argues that (1) he made no specific threat to cancel the parties' civil ceremony or to stop the emigration process if Wife did not sign the prenuptial agreement, and (2) Wife's act of signing the contract was a decided and deliberate choice on her part, both of which precluded a finding of coercion. Notwithstanding Husband's arguments, because there is competent, substantial evidence in the record to support the trial court's findings to the contrary, we are compelled to affirm.

At his deposition, Husband made it clear that Wife knew that he would not marry her unless she signed a prenuptial agreement:

> Q. If [Wife] tells you no, I'm not signing a prenup you
> would have been done?
>
> A. Out of there.
>
> Q. So it was a prenup or bust?
>
> A. There is a lot of bust but that was definitely a bust. She
> knew about them ahead of time. . . .

Husband's ultimatum, *by itself*, did not constitute the level of compulsion necessary for coercion. See Doig v. Doig, 787 So. 2d 100, 103 (Fla. 2d DCA 2001) (concluding that an ultimatum that there would be no wedding without a prenuptial agreement "does not, in itself, constitute duress"); Eager v. Eager, 696 So. 2d 1235, 1236 (Fla. 3d DCA 1997) ("It is not a threat or duress for the proponent to make it clear that there will be no marriage in the

18

absence of the agreement."). Additional acts by Husband, however, raised the level of compulsion into the realm of coercion.

Husband repeatedly told Wife that "it was a requirement" that the prenuptial agreement be signed for Wife to come to the United States. More important, Husband told Wife she needed to sign the prenuptial agreement before their upcoming appointment with the Colombian embassy, implying that signing the agreement was part of the emigration process. Contrary to what Husband told Wife, immigration to the United States is not conditioned on the execution of a prenuptial agreement. These acts, combined with the time pressure aspects[10] of the parties' courtship and Wife's vulnerable physical and emotional condition following the abortion, constitute competent, substantial evidence to support the trial court's finding of coercion. See Ziegler, 279 So. 3d at 1241, 1243 (concluding that the parties' prenuptial agreement was the product of duress where the husband "threatened life-altering consequences, by imperiling their shared, long-term plan to begin life anew with their children to the United States"; specifically, the day before the wedding in Venezuela, "the husband threatened to cancel the ceremony if the wife did not sign the agreement, and advised her that a failure to obtain the marriage certificate on the planned date would thwart the

---

[10] See footnote 8, *supra*.

19

couple's imminent plan to emigrate to the United States"); Hjortaas v. McCabe, 656 So. 2d 168, 170 (Fla. 2d DCA 1995) (concluding the "timing of the signing" of the prenuptial agreement indicated the wife's signature was the product of duress, where the agreement was presented to the wife two days before the wedding – "the actual terms of which were previously unknown to her" – giving the wife one day "to make an independent evaluation of the contract, or to cancel her wedding"); Flaherty, 128 So. 3d at 921-23 (concluding the prenuptial agreement was the product of duress where the husband gave the wife an edited version of the agreement at the Las Vegas airport, at 11:30 p.m., the night before a destination wedding, and the wife spent the next several hours frantically trying to find a notary and never read the agreement prior to signing it); Lutgert v. Lutgert, 338 So. 2d 1111, 1114 (Fla. 2d DCA 1976) (invalidating the prenuptial agreement where the husband presented the prenuptial agreement to the wife a day before the wedding, while the parties were at the jewelry store sizing their wedding rings, and the husband insisted that the wife sign the agreement or the wedding would be called off); Francavilla v. Francavilla, 969 So. 2d 522, 525 (Fla. 4th DCA 2007) (recognizing that "the time pressure aspect of cases" can support a trial court's determination as to whether a prenuptial agreement should be set aside because it was the product of duress).

Finally, we recognize that Wife's testimony that she would have signed anything Husband presented her is an indication that her signing the prenuptial agreement was a volitional act. Nevertheless, under the particular facts and circumstances of this case, we conclude there were "sufficient coercive circumstances" surrounding the execution of the prenuptial agreement to give rise to a presumption that Wife did not execute the agreement of her own free will. Lutgert, 338 So. 2d at 1115-16; Flaherty, 128 So. 3d at 923. The trial court clearly found that Husband did not sufficiently rebut this presumption at trial. On this record, we do not disturb this finding.

## IV. CONCLUSION

We are "mindful that it is not within the province of an appellate court to substitute its judgment for that of the trier of fact." Baker, 394 So. 2d at 466. Taking, as we are required to do, the facts most favorably in support of the trial court's decision, Waton, 887 So. 2d at 422, we conclude there is not competent, substantial evidence to support the trial court's determination that the parties' prenuptial agreement was the product of duress; there is, however, competent, substantial evidence to support the trial court's determination that the agreement was the product of coercion. Accordingly,

21

we affirm the August 30, 2019 non-final order invalidating the subject prenuptial agreement.

Affirmed.

LOGUE, J., concurs.

LINDSEY, J., dissenting in part.

I agree there is no competent substantial evidence to support the trial court's finding of duress, but I respectfully dissent from the majority's conclusion that there is competent substantial evidence that the parties' prenuptial agreement was the product of coercion. I would reverse the order on appeal because the trial court's findings established that the wife voluntarily signed the prenuptial agreement, and the trial court committed legal error when it relied on the expansive definition of coercion set forth in a special concurrence to an unwritten per curiam affirmance. See Gribbin v. Gribbin, 499 So. 2d 858, 862 (Fla. 4th DCA 1986) (Glickstein, J., concurring specially).

As an initial matter, the trial court's order appears to conflate two separate grounds by which a spouse may challenge a prenuptial agreement. The first ground, which is applicable here, requires the challenging spouse to establish "fraud, duress, coercion, mispresenting or over-reaching." Casto v. Casto, 508 So. 2d 330, 333 (Fla. 1987) (citations omitted). The second ground has to do with unreasonableness. Id.; see also § 61.079(7)(a) (setting forth grounds under which a premarital agreement is not enforceable). To establish unreasonableness, the challenging spouse must

23

present evidence of the parties' relative situations. <u>Casto</u>, 508 So. 2d at 333. As the majority correctly observes, the trial court's order invalidates the agreement due to duress and coercion (ground one). However, the trial court's analysis seems to rely on the unreasonableness test (ground two) by invalidating the agreement due to the parties' relative bargaining positions.

With respect to duress and coercion, I agree with the majority that "[i]n either instance (duress or coercion), the act of compulsion must be sufficient to overcome the recipient's free will such that the recipient's actions are not of his or her own volition." <u>See also</u> <u>Dienstag v. Dienstag</u>, 864 So. 2d 9, 11 (Fla. 3d DCA 2003) ("Whether the terms of the agreement are fair is of no consequence providing that the wife entered into the contract freely and voluntarily.").

Here, the trial court's findings establish that Mrs. Bates acted voluntarily. More specifically, although Mrs. Bates testified that she went to Latin Connection to practice her English, the trial court found that "Mrs. Bates did not go to the Latin Connection merely to practice her English as she contends. It was her intention to sign up with the Latin Connection dating service to search for an American husband who was wealthy and who would help her leave Colombia with legal immigration status in the United States." Moreover, the court also found that the legal wedding was performed at an

earlier date for Mrs. Bates's benefit, so she "could begin the immigration process as soon as possible." Finally, the court accepted Mrs. Bates's testimony that "she would have signed anything no matter what was contained in the agreement because she loved Paul. She also wanted to come to the United States and enjoy the attributes that came along with marrying a wealthy established American pilot."

Importantly, the court explicitly found that "[t]he fact that Mrs. Bates would have signed anything to marry Mr. Bates *appears to benefit Mr. Bates' argument that the agreement was executed freely and voluntarily.*" (Emphasis added). But despite these findings, the court relied on "the disparity of the parties [sic] bargaining position" and a number of "red flags"—such as Mrs. Bates's age, her limited English, and her lack of business experience—in order to find that "Mrs. Bates was indeed persuaded, coerced and under emotional duress when she executed the prenuptial agreement."

The trial court also improperly relied on Judge Glickstein's special concurrence to a per curiam, unwritten affirmance in <u>Gribbin</u> to get around the evidence that the agreement was voluntary. This special concurrence, citing a case from the Ohio Supreme Court,[11] asserts that "[c]oercion is

---

[11] The special concurrence in <u>Gribbin</u> relied on <u>State v. Woods</u>, 357 N.E.2d 1059 (1976), an opinion that considered the meaning of duress and coercion in the context of mitigating a death sentence under Ohio law where the

generally defined more broadly [than duress] to include undue influence and lesser forms of compulsion." Id. Mrs. Bates relied on Gribbin's special concurrence in the lower court to argue that "[c]oercion may include a compulsion brought about by moral force or in some other manner with or without physical force." See id. The lower court, in its order invalidating the parties' prenuptial agreement, adopted this analysis.

Because the special concurrence in Gribbin has no precedential value, I would hold that the trial court committed legal error when it relied on the definitions of duress and coercion set forth in Gribbin. See Dep't. of Legal Affs. v. Dist. Ct. of Appeal, Fifth District, 434 So. 2d 310, 311 (Fla. 1983) (holding that an unwritten per curiam affirmance has no precedential value); St. Fort ex rel. St. Fort v. Post, Buckley, Schuh & Jernigan, 902 So. 2d 244, 245 (Fla. 4th DCA 2005) ("We reiterate that a per curiam affirmance without written opinion, even one with a written dissent, has no precedential value and should not be relied on for anything other than res judicata."); see also Philip J. Padovano Appellate Practice § 20:7 (2019 ed.) ("The value of an appellate decision as a precedent is derived from the written opinion of the court. A per curiam decision without a supporting opinion is binding on the

defendant claimed he would not have committed the crime if he had not been under duress or coercion.

26

parties under the doctrine of the law of the case, but it is not a precedent for future cases. An appellate decision does not establish a precedent if the court did not write an opinion. Furthermore, the only kind of written opinion that has any precedential value is a majority opinion." (footnote omitted)). Moreover, because the trial court's factual findings establish that the agreement was entered into voluntarily, I would reverse the order on appeal invalidating the parties' prenuptial agreement.